441 P.2d 73

Manuel PESQUEIRA, Appellant,

v.

Ruth W. TALBOT and Warren J. Talbot,
husband and wife, Appellees.

No. 2 CA–CIV 455.

Court of Appeals of Arizona.
Division 2.
May 9, 1968.

Rehearing Denied May 31, 1968.
Review Denied June 25, 1968.

Murphy & Vinson, by Carl E. Hazlett, Tucson, for appellant.

Spaid, Fish, Briney & Duffield, by Richard Duffield, Tucson, for appellees.

MOLLOY, Judge.

This case involves consideration of the "family purpose doctrine." We are called upon to determine whether, notwithstanding that doctrine, summary judgments were properly entered in favor of the mother and father of a minor female whose alleged negligent operation of an automobile resulted in injuries to plaintiff.

From the evidence before the court on the motions for summary judgment, which include depositions of the mother and driver-daughter and an affidavit of the latter, together with various other depositions and exhibits, the case in its present posture may be stated as follows.

The accident occurred on February 16, 1966. The defendant, Carolyn Ruth Talbot (hereinafter "Carolyn") was at that time driving a 1965 model Corvette Sting Ray automobile, which had been purchased on July 13, 1965. Carolyn was 18 years of age when the car was purchased. She was 19 when the accident occurred.

At all times relevant here, Carolyn lived at home with her mother, the defendant Ruth W. Talbot. For about a year prior to purchasing the Corvette automobile, and through the time of the accident, Carolyn was employed, earning a take-home pay at the time of her deposition of about $128 bi-weekly. She kept her earnings and did not pay her mother rent or room and board.

Sometime prior to July, 1965, Carolyn went to O'Rielly Motors Company, selected the car she wanted and wrote a check for $100 as a down payment therefor. At that time, Carolyn was regularly driving and using a 1960 Chevrolet car owned by Mrs. Talbot. The 1960 Chevrolet was referred to by Mrs. Talbot in her deposition on at least one occasion as "her" (Carolyn's) car.

The Corvette automobile was purchased in a cash transaction. From the record it would appear that the net cash price was $4,856.30, after the $100 down payment. In any event, Mrs. Talbot wrote a check to the dealer in an amount in excess of $4800, and received a receipt in the amount of $5,012.19. Notwithstanding the cash nature of the transaction, the dealer required Mrs. Talbot to execute a sales contract entitled "Automobile Agreement." This was in accordance with the dealer's established policy of requiring that an adult be the purchasing party. The testimony of the dealer's business manager was that, although its transaction was, "for practical purposes," with Carolyn, it regarded Mrs. Talbot as the purchaser of the car. Just above Mrs. Talbot's signature on the sales contract there appears the handwritten statement, "I authorize the title to be in the name of Caro-

lyn Talbot." The title was accordingly put in Carolyn's name and delivery of the car and the dealer's or manufacturer's warranty was made to her.

The record is not entirely clear as to the respective contributions of mother and daughter toward the purchase price. Carolyn's testimony is that she had saved $1800 and that her mother's payment in excess of $4800 accordingly constituted a loan to her of something over $3,000. Mrs. Talbot testified at one point that Carolyn "borrowed about three thousand," but she variously stated Carolyn's initial contribution paid on or about the purchase date to be a thousand dollars, or twelve or thirteen hundred dollars, which would have resulted in a deficit vis-a-vis the purchase price. Whatever the amount paid by Carolyn to her mother, the testimony is that it was in cash and that no record was made thereof.

Both mother and daughter state that there was an agreement between them that Carolyn would repay her mother at the rate of $120 per month. The agreement was likewise not in writing. Carolyn testified that she made seven payments in the amount of $120 to her mother prior to the accident in February, 1966. By December of 1966, Mrs. Talbot testified that the entire amount of her loan to her daughter had been repaid. The Corvette car had been sold in the meantime. The testimony is that part of the payments to Mrs. Talbot were made by check, and part in cash. Neither party kept a written record of the payments made.

Mrs. Talbot testified that the 1960 Chevrolet automobile owned by her and used by Carolyn prior to purchase of the Corvette was sold in a separate transaction at about the same time the Corvette was purchased. Mrs. Talbot testified that "we sold it because she [Carolyn] was getting another car." Mrs. Talbot stated that no part of the proceeds on sale of the 1960 Chevrolet were used to purchase the Corvette. Mrs. Talbot regularly used another car which she owned. Following the accident here involved, Mrs. Talbot purchased another car which Carolyn used regularly.

At the time of purchase of the Corvette, Carolyn applied for separate policies of collision and liability insurance. The policies were issued to her in her own name. However, it appears from the record that Mrs. Talbot wrote or endorsed a second check in the amount of $291 to O'Rielly Motors, who took the collision insurance application, apparently to be applied to payment of premiums on that policy.

In her affidavit, Carolyn stated that she made all payments for maintenance and repair of the Corvette; that she did not need her mother's permission to use it; and that her mother exercised no control over the automobile or her use thereof. Carolyn drove the car to and from work and for pleasure. She was driving it to work at the time of the accident involved in this case.

From May of 1964, until after the accident in suit, Carolyn's father, the defendant, Warren J. Talbot, was in Texas. He lived with Mrs. Talbot prior to going to Texas and is presently home on weekends while seeking employment in Phoenix. Mrs. Talbot's testimony is to the effect that she used funds in a bank account in her name to finance the purchase of the Corvette. Mrs. Talbot is regularly employed.

Against the foregoing factual background, plaintiff seeks to hold the mother and father liable under the family purpose doctrine, adopted for Arizona in the case of Benton v. Regeser, 20 Ariz. 273, 179 P. 966 (1919). Like most decisions in other states first adopting the family purpose doctrine, *Benton* used the language of the law of agency and held the parental head of the household liable under the principle of *respondeat superior*:

"The cases cited firmly establish the rule that a father who furnishes an automobile for the pleasure and convenience of the members of his family makes the use of the machine for the above purposes his affair or business, and that

any member of the family driving the machine with the father's consent, either express or implied, is the father's agent. We are convinced that the rule is based on sound reason and that it is supported by the great weight of authority, and therefore shall adopt it as the rule in this jurisdiction." 20 Ariz. at 278, 179 P. at 968.

Legal scholars have not been loathe to point out that the "agency for pleasure" precepts of the family purpose doctrine do not square with established principles of agency law. Prosser refers to a "manufactured agency" which is a "transparent device intended to place the liability upon the party most easily held responsible." Prosser, Law of Torts, at 497 (3d ed. 1964).

Other publicists in the field of torts are more prone to commend the rule:

> "It is to be observed that the agency explanation of the 'family car' principle is not very convincing. This, however, in no sense militates against the desirability of the doctrine as a matter of social engineering. The appalling toll of accidents, steadily mounting, affords startling evidence of the hazards due to the use of high-powered motor vehicles. The dangers to the public from incompetent and financially irresponsible drivers is a menace of such gravity that every precaution is necessary to reduce such perils to the minimum. When a parent provides an automobile for the pleasure and convenience of his family, it is not too much to demand that he insure society against its negligent use for such purposes. He may avail himself of the protection of insurance against such hazards, but he should not be permitted to throw the risk upon the innocent victims of his family's negligence in the use of such an agency as an automobile with which he has provided them." Harper and James, The Law of Torts § 8.13, at 661–662.

■ Though our Safety Responsibility Act, A.R.S. § 28–1101 et seq., makes the doctrine somewhat less necessary from a socio-economic standpoint, and though the doctrine is unattractive in that it does not fit neatly into the broad mosaic of our law, as an intermediate appellate court we are precluded from examining whether this doctrine judicially created should be judicially abrogated, McKay v. Industrial Commission, 103 Ariz. 191, 438 P.2d 757 (1968).[1]

■ Accordingly, we address ourselves to the task of determining the boundaries of this doctrine, which has given rise to a plethora of judicial decisions, to determine whether the facts here fall within the arguable periphery of liability. Unless the undisputed facts lead inexorably to a conclusion of nonliability, summary judgment was not proper. Peterson v. Valley National Bank of Phoenix, 90 Ariz. 361, 368 P.2d 317 (1962).

Because of its insecure agency foundation, formulation of a universally applicable test of parental liability under the family purpose doctrine has proven difficult. Appellees in this case have called our attention to a recent attempt at formulation of such a test made by the author of a selective annotation or comment note entitled "Modern Status of Family Purpose Doctrine with Respect to Motor Vehicles," in 8 A.L.R.3d, commencing at 1191. It is stated at 1196 of the article that the car in question must be "owned or controlled" by the parent charged in order to fasten liability upon him or her, and at 1199, under "Practice pointers," these requirements are modified to state that it must be shown by the plaintiff that the defendant-parent actually either "owned, controlled, or maintained" the car in question. Appellees assert that there is no evidence in the record that either Mr. Talbot or Mrs. Talbot owned, controlled, or maintained the Corvette car driven by Carolyn, and that accordingly

1. At least three courts of last resort have done this. See McMartin v. Saemisch, 254 Iowa 45, 116 N.W.2d 491 (1962); Jacobsen v. Dailey, 228 Minn. 201, 36 N.W.2d 711, 11 A.L.R.2d 1429 (1949); and Hackley v. Robey, 170 Va. 55, 195 S.E. 689 (1938).

they were entitled to the summary judgments granted to them in the lower court.

We think that either appellees are reading that portion of the test noted above more narrowly than it was intended to be read or that the stated rule itself is too restrictive to encompass the tests applied and results obtained in all jurisdictions. In two cases from the State of Washington cited in the article at 8 A.L.R.3d 1209, Foran v. Kallio, 56 Wash.2d 769, 355 P.2d 544 (1960), and Jerdal v. Sinclair, 54 Wash.2d 565, 342 P.2d 585 (1959), the court set forth a test which would hold liable a parent who "owned, *furnished,* or maintained" a family car (emphasis ours). In the *Foran* case, the court referred to the rule stated in 7–8 Huddy, Automobile Law § 125, at 320–26, that the parent charged must "own, *provide,* or maintain" the family car (emphasis ours). Family purpose decisions from the State of Georgia refer to liability where the parent "supplies" the car to the minor. Sledge v. Law, 113 Ga.App. 746, 149 S.E.2d 758 (1966), and authorities cited therein.

In the case of Mortensen v. Knight, 81 Ariz. 325, 305 P.2d 463 (1956), our Court stated that the family purpose doctrine " * * * rests not on the ownership of the vehicle but upon the *control and use.*" (Emphasis ours.) 81 Ariz. at 332, 305 P.2d at 468. In support of that statement, the Court in *Mortensen* cited and quoted at length from the case of Hexter v. Burgess, 52 Ga.App. 819, 184 S.E. 769 (1936), in which the head of the family was held liable although his wife was driving a car owned by a corporation at the time of the accident. The "control and use" test set forth in *Mortensen* sets this jurisdiction apart from those which require actual ownership of the vehicle to be in the parent in order for the doctrine to apply. See, e. g., Bolton v. Schimming, 226 Or. 330, 360 P.2d 540 (1961).

Our Supreme Court's reliance upon Georgia decisions where the court gives "extensive application to the doctrine," Ferguson v. Gurley, 218 Ga. 276, 127 S.E.2d 462, 465 (1962), would seem to indicate that the family purpose doctrine is to be given broad effect in Arizona.

■ Reading *Benton* and *Mortensen* together, and borrowing to some extent from law in other jurisdictions, particularly Georgia, we believe the substantial requisites for the application of this anomalous doctrine, insofar as this case is concerned, may be stated thus: there must be a family with sufficient unity so that there is a head of the family, the motor vehicle responsible for the injury must have been one "furnished" by the head of the family to a member of the family and this vehicle must have been used on the occasion in question by the family member with the implied or express consent of the head of the family for a family purpose.

Applying these principles to the case at bar, we believe that summary judgment against the doctrine should not have been rendered. The first requirement is clearly met—a family relationship existed insofar as this mother and daughter are concerned in this case. A "family" has been defined as:

"   *   *   *   the body of persons who live in one house and under one head including parents, children, servants, and lodgers or boarders; specif.: a group of persons sharing a common dwelling and table. *   *   * "  Webster's Third International Dictionary Unabridged (G. & C. Merriam Co. 1964).

■ Here, mother and daughter were sharing the same abode and the same table. It has been held that, in order for there to be a "head of the family," the other members of the family must be wholly or partially dependent upon such person. Jones v. Golick, 46 Nev. 10, 206 P. 679, 683 (1922); Manning v. Hart, 255 N.C. 368, 121 S.E.2d 721 (1961). This element is supplied here in that the mother provided the daughter with room and board.

■■ Whether the father is a member of the family is not clear from the record. It is possible that the mother, while living apart from her husband under these circumstances, was the head of a separate family exclusive of her husband, see A.R.S. § 25-213, or, that she was acting for the com-

munity of herself and her husband in the matters with which we are concerned. If the former was the situation, we believe she should be considered in law as the head of the family, as in a common-law jurisdiction. See Rutherford v. Smith, 284 Ky. 592, 145 S.W.2d 533 (1940). If the latter was in fact the case, liability under the subject doctrine is imposed upon the community. Mortensen v. Knight, 81 Ariz. 325, 334, 305 P.2d 463, 469 (1956); and see Moffitt v. Krueger, 11 Wash.2d 658, 120 P.2d 512 (1941).

**▆▆▆** As to the question of "furnishing," we think that in view of the substantial role of the mother in financing acquisition of the Corvette automobile, a trier of fact might conclude that this car was "furnished" by her within the meaning of Benton v. Regeser. Our Supreme Court did not spell out what was meant by this key word in *Benton*, and it is possible that it intended a meaning much more restrictive than we adopt here. But certainly, a permissible connotation in the light of our Supreme Court's pronouncements is that the parent "furnishes" the motor vehicle when the parent through a substantial gift or a nonbusinesslike loan makes it possible for the child to purchase a car that the child would otherwise not have been able economically to acquire. We believe this is the test used, though not verbalized, in Sledge v. Law, 113 Ga.App. 746, 149 S.E.2d 758 (1966).

From the perspective of the socio-economic objective, we can see at least as much reason to enforce the doctrine when the car is made available by a parental, nonbusinesslike loan as when the car is a gift from the parent. From the standpoint of the persons who may be injured by the vehicle furnished, a loan is more disadvantageous than a gift, for the child will usually be more impecunious if he has been a borrower of money rather than a donee. As far as "control" is concerned, the lender has the leverage of the legal right to enforce repayment while the donor has no such right. At least two decisions regard a gift of the car by the parent as being equivalent to furnishing the car. See Pouliot v. Box, 56 N. M. 566, 246 P.2d 1050 (1952), and Robinson v. Ebert, 180 Wash. 387, 39 P.2d 992 (1935).

Insofar as this intra-familial type of loan is concerned, at such times as it might be repaid, the element of "furnishing" may cease, but this is not before us now, as it is undisputed there was a substantial "loan" still outstanding at the time of this accident.

**▆▆▆** Under the record as it now exists, we see no factual issue as to whether the car was being used at the time of the accident with the implied or express permission of the mother for a family purpose. In Ferguson v. Gurley, 218 Ga. 276, 127 S.E.2d 462 (1962), the court held that the wife's use of a vehicle provided to her by the husband to drive to work served her comfort and convenience and was accordingly a use of the vehicle for a family purpose. The parents, in Arizona, as in most states, are obligated to support a minor child. Barrett v. Barrett, 44 Ariz. 509, 39 P.2d 621 (1934); see 39 Am.Jur. Parent and Child § 40, at 645; and 67 C.J.S. Parent and Child § 17, at p. 704; and see A.R.S. § 1–215(15) making twenty-one the age of majority. Certainly, when Carolyn was using this car to earn her own living, she was serving a family purpose. There is no suggestion in the record that either of her parents objected.

**▆▆▆** In not regarding "control" as a separate criterion, we have not directly confronted the dichotomy seen by at least one court, Smith v. Simpson, 260 N.C. 601, 133 S.E.2d 474, 480 (1963), between control of the child as opposed to control of the car. We believe there is sufficient "control" inherent in the elements of "head of the family," "furnishing," and "permission" to satisfy the requirement of Mortensen. We confess we can see only a tenuous line between controlling a vehicle and controlling the driver of the vehicle, in the context of a third person being injured by the vehicle when controlled by that driver. We do not believe, in any event, that *Mortensen* intended to refer to the actual control over the

particular child as being critical; such a test would place a premium upon the incorrigibility of the child.

We would not be understood as holding in effect that a minor may never, without exposing the head of the family to liability, make use of parental resources to purchase an automobile to be owned and used exclusively by the minor. To preclude the trier of fact from finding the family purpose doctrine applicable, however, the acquisition of the motor vehicle must be more independent of substantial beneficence from the parent than is apparent from the present record before us.[2]

Reversed and remanded.

HATHAWAY, C. J., and KRUCKER, J., concur.

2. See, e. g., Calhoun v. Eaves, 114 Ga. App. 756, 152 S.E.2d 805 (1967), in which case a son, during the time he was arranging for the sale of some stock, borrowed funds from his father to purchase a car, the loan being repaid when the sale of stock was consummated. The court upheld the granting of summary judgment in the father's favor.