0772

Clarence Edward CAMPBELL, Respondent v. Kimberly Kaye PASCHAL, Mark W. Paschal, and John Paschal, Jr., Appeal of John PASCHAL, Jr.

(347 S. E. (2d) 892)

Court of Appeals

*A. Parker Barnes* of *Barnes, Davis & Tupper*, Beaufort, *A. Camden Lewis* and *Daryl G. Hawkins* of *Lewis, Babcock, Gregory & Pleicones*, Columbia, *for appellant.*

*James B. Richardson, Jr.*, Columbia and *Samuel Svalina*, of *Dowling, Sanders, Dukes & Svalina*, Beaufort, *for respondent.*

Heard May 28, 1986.

Decided Aug. 4, 1986.

GOOLSBY, Judge:

This action arises out of a motor vehicle accident involving the plaintiff Clarence Edward Campbell and one of the defendants, Kimberly Kaye Paschal. The other defendants are Kimberly's father, John Paschal, Jr. and her brother, Mark W. Paschal, the owner of the car Kimberly was driving when the accident occurred. In the trial court, the jury returned a verdict for Campbell against Kimberly and John Paschal in the amount of $260,000 actual damages. Only John Paschal appeals. We affirm.

The questions on appeal concern (1) the trial court's direction of a verdict against Kimberly on the issue of liability, (2) the applicability of the family purpose doctrine where the head of the household is not the title owner of the vehicle involved in the accident, (3) the failure of the trial court to strike the allegations of agency from the complaint, (4) the failure of the trial court to question a juror seen talking with Campbell during a lunch recess, (5) an unintroduced exhibit challenged as hearsay and as being undisclosed before the trial in answer to interrogatories and the limitation placed by the trial court on the cross-examination of the witness through whom the exhibit was proffered, (6) the trial court's charge regarding the duty owed by motorists to keep a proper lookout, (7) the consideration by the jury of future medical expenses as an element of damages, (8) the admissibility of certain testimony offered by Campbell's economic loss expert, (9) the trial court's failure to charge certain federal statutes of which it had taken judicial notice, and (10) the admissibility of opinion testimony as to the probability of Campbell being medically discharged from the United States Marine Corps.

I.

Paschal argues that the trial court erred in directing a verdict against Kimberly on the issue of liability because there was evidence in the record from which a jury could find that Campbell was contributorily negligent. We disagree.

In deciding a motion for directed verdict, the evidence and all reasonable inferences that can be drawn therefrom must be viewed in the light most favorable to the party opposing the motion. *Cope v. Eckert,* 284 S. C. 516, 327 S. E. (2d) 367 (Ct. App. 1985). If more than one reasonable inference can be drawn from the evidence, the case should be submitted to the jury. *Scott v. Meek,* 230 S. C. 310, 95 S. E. (2d) 619 (1956). Generally, the issues of negligence and contributory negligence are questions of fact for the jury. *Williams v. Kinney,* 267 S. C. 163, 226 S. E. (2d) 555 (1976); *Cope v. Eckert, supra.* Where the evidence is susceptible of only one inference, however, contributory negligence becomes a question of law for the court. *House v. European Health Spa,* 269 S. C. 644, 239 S. E. (2d) 653 (1977).

In this case, the evidence viewed in the light most favorable to Kimberly is susceptible of only the inference that Kimberly's negligence alone proximately caused the accident.

On August 30, 1981, at or about 7:00 p.m., Kimberly was driving a 1978 Camaro westbound on South Carolina Highway 170 in Beaufort County. Campbell was riding a motorcycle, which had its headlight on, and was traveling eastbound on Highway 170. Kimberly and Campbell collided at the intersection of Highway 170 and South Carolina Highway 280.

The intersection is controlled by a light that flashes yellow for traffic on Highway 170 and red for traffic on Highway 280. An "Intersection Ahead" sign is posted approximately two-tenths of a mile before the intersection for motorists traveling eastbound on Highway 170. The speed limit on Highway 170 is 55 miles per hour.

Just prior to the collision, Kimberly signaled she was turning left onto Highway 280. According to Campbell and to a South Carolina Highway Patrolman who witnessed the accident, Kimberly suddenly turned left in front of Campbell when Campbell was no more than fifteen feet away from her vehicle.

Campbell's motorcycle struck Kimberly's car. The collision sent Campbell catapulting into the air. He landed on the ground after hitting a vehicle stopped at the northbound stop sign on Highway 280.

The patrolman first observed the motorcycle when it was 200 or 300 yards from the intersection. In the patrolman's opinion, Campbell was going only 45 or 50 miles per hour as he approached the intersection. The patrolman testified that Campbell could not have done anything to have avoided the accident.

Wyman Amsler, another witness to the accident and the person whose automobile Campbell's body hit, testified that he heard Campbell's motorcycle deaccelerate prior to Kimberly turning in front of Campbell. He estimated that Campbell was going 38 to 40 miles an hour when the accident occurred.

Kimberly, who was 15 years old at the time of the accident and had obtained her restricted license less than a week before, testified that she stopped at the intersection, looked for oncoming traffic, and, seeing none, proceeded to make her turn. She admitted that it was a clear day and that her view was unobstructed. She testified that she never saw Campbell or his motorcycle before colliding with them.

Under Section 56-5-1000(a)(2) of the 1976 South Carolina Code of Laws, as amended, drivers of vehicles entering an intersection controlled by a flashing yellow light "may proceed through the intersection or past such signal only with caution." Paschal argues that the question of Campbell's contributory negligence and hence the question of liability should have been submitted to the jury because the evidence shows that Campbell ignored the warning sign and caution light as he approached and entered the intersection and did not reduce his speed as required.

Before the negligence of a plaintiff may defeat recovery, it must be shown that it contributed to the accident as a proximate cause. *Clyde v. Southern Public Utilities Co.*, 109 S. C. 290, 96 S. E. 116 (1918). A want of ordinary care is not a proximate cause of an injury where the negligence of the other party "is a more immediate, efficient cause." *Bodie v. Charleston & W.C.R. Co.*, 61 S. C. 468, 486, 39 S. E. 715, 721 (1901).

We agree with the trial judge that the real and efficient cause of the accident was not Campbell's speed but Kimberly's negligent act of turning her car suddenly into the path of Campbell's motorcycle as Campbell entered the intersection.

There is no evidence from which it could reasonably be inferred that Campbell was traveling at an excessive rate of speed just prior to the collision. In fact, it is undisputed that Campbell slowed down as he entered the intersection. There is evidence, however, that Kimberly turned unexpectedly in front of Campbell when he was only ten to fifteen feet away from Kimberly's automobile. In so doing, Kimberly "created a trap from which [Campbell] could not escape." *Odom v. Steigerwald*, 260 S. C. 422, 428, 196 S. E. (2d) 635, 638 (1973).

## II.

Paschal next argues that the trial court erred in denying his motion for an involuntary nonsuit on the ground that the family purpose doctrine is inapplicable where the head of the household is not the owner of the vehicle causing an injury. Again, we disagree.

In one of its earliest treatments of the family purpose doctrine, the South Carolina Supreme Court said: "A necessary requisite to the imposition of liability under the family purpose doctrine ... is that the head of the family own, maintain, *or* furnish the automobile ... for general family use ..." *Porter v. Hardee*, 241 S. C. 474, 477, 129 S. E. (2d) 131, 132 (1963) [Italics ours.]

Later cases used slightly different language: "[A] head of a family, who owns, furnishes *and* maintains a vehicle for the general use, pleasure and convenience of his family is liable for the negligence of a member of the family having general authority to operate the vehicle for such a purpose." *Lucht v. Youngblood*, 266 S. C. 127, 133, 221 S. E. (2d) 854, 857 (1976) [Italics ours]; *see also Lollar v. Dewitt*, 255 S. C. 452, 179 S. E. (2d) 607 (1971); *Sweatt v. Norman*, 283 S. C. 443, 322 S. E. (2d) 478 (Ct. App. 1984). Paschal relies upon this difference in language in arguing that ownership is a prerequisite to the application of the family purpose doctrine.

A careful reading of *Lucht* and *Lollar*, however, reveals that these decisions complement, rather than overrule, *Porter v. Hardee*. In fact, in *Lucht* the Supreme Court expressly dismissed the notion that the *Porter v. Hardee* line of cases was no longer good law.

Furthermore, the requirement of ownership was not specifically in issue in any of the reported family purpose doctrine cases in South Carolina because in all of them the

head of the household was in fact the owner of the vehicle involved in the accident.

The issue of whether the head of a household must be the legal owner of a car involved in an accident in order for the family purpose doctrine to apply has been decided adversely to Paschal's position by courts of other jurisdictions. *See e.g. Tolbert v. Murrell*, 253 Ga. 566, 322 S. E. (2d) 487 (1984); *Herman v. Magnuson*, 277 N. W. (2d) 445 (N. D. 1979); *Pesqueira v. Talbot*, 7 Ariz. App. 476, 441 P. (2d) 73 (1968); *Smith v. Simpson*, 260 N. C. 601, 133 S. E. (2d) 474 (1963); *Jerdal v. Sinclair*, 54 Wash. (2d) 565, 342 P. (2d) 585 (1959).

The family purpose doctrine had its genesis in the law of agency. *Norwood v. Partemos*, 230 S. C. 207, 95 S. E. (2d) 168 (1956). The doctrine is based on the theory that one "who has made it his business to furnish a car for the use of his family is liable as principal or master when such business is being carried out by a family member using the vehicle for its intended purpose, the family member thereby filling the role of agent or servant." Annot., 8 A.L.R. (3d) 1191 at 1196 (1966).

In this case, the car Kimberly was driving at the time of the accident belonged to her older brother Mark. Kimberly, who was, as we mentioned, 15 years old at the time of the accident, lived at home with her parents. On the date of the accident, Mark was in the Navy and stationed overseas.

Mark had purchased the automobile using his own money. It was titled solely in his name.

Mark testified that, before leaving to go overseas in January, 1981, he left the car at his parents' home. He gave his father authority to regulate its use. Paschal agreed to keep the car in good running condition.

Paschal testified that he and his wife occasionally drove Mark's car to run errands.

Kimberly acknowledged that she had twice driven Mark's car before the day of the accident. On this particular day, a Sunday, Kimberly's father asked her to take her younger sister, Kelly, to church for him because he had company at the house. Kimberly noticed that her mother's automobile was blocked by the guest's car in the driveway. Her father's automobile was available for her to use but she could not drive it because it had a manual transmission.

Kimberly, according to Paschal, asked him if she could use Mark's car, the only other available vehicle. He consented.

Kimberly stated that she took the keys off the hook in the kitchen where all the family's keys were kept and left with Mark's car.

■ Kimberly's use of her brother's automobile on this occasion clearly meets the requirements of the family purpose doctrine. Kimberly's father, who was the head of the Paschal household, controlled the use of the automobile. He, and not Mark, furnished the car to Kimberly when she asked to use it. The transportation of Kimberly's sister to church was ordinarily Paschal's responsibility and thus Kimberly's performance of this errand clearly served a general family purpose.

To allow Paschal to avoid liability simply because he was not the title owner of the vehicle would defeat the purpose of the family purpose doctrine.

### III.

Paschal next argues that the trial court erred in failing to strike the allegations of agency from the complaint at the end of Campbell's case and in submitting the issue of agency to the jury because there was "no proper allegation of a purely principal and agent relationship between [Paschal] and [Kimberly]" in the complaint.

The trial court sent this case to the jury on two separate theories of liability, the family purpose doctrine and ordinary *respondeat superior* principles.

■ Where a jury returns a general verdict involving two or more issues and its verdict is supported as to at least one issue, the verdict will not be reversed. *Anderson v. West*, 270 S. C. 184, 241 S. E. (2d) 551 (1978).

Because it was proper for the jury to consider the family purpose doctrine as a theory of liability and because the jury returned a general verdict for Campbell, we find it unnecessary to decide whether the trial court committed error in refusing to strike the allegations of agency from the complaint and in submitting the issue of *respondeat superior* to the jury. The verdict can stand on the family purpose doctrine alone.

## IV.

Paschal further contends the trial court committed reversible error in denying his and the other defendant's request to question a juror about the juror's conversation with Campbell during a lunch recess.

During the trial of this case, Doreen Kelley, a spectator and a friend of the Paschal family, reported to the trial judge that she saw Campbell and a juror in conversation while the court was in recess for lunch. The attorneys and the trial judge thereupon questioned Kelley.

She stated that shortly before court was scheduled to reconvene, she saw Campbell sitting at counsel table in the courtroom talking to another person. She left the courtroom but returned after a brief period. Campbell and the person were still engaged in conversation. Kelley heard the other person offer Campbell "some chocolate or something" and heard Campbell remark "about something being too sweet." She said that she actually observed them each time for only twenty seconds and that the total amount of time that elapsed from the first time she saw them until the time she left for good was about three minutes. Kelly identified the other person as a juror.

Campbell testified that during the lunch recess a man approached him in the courtroom and offered him some cake or a doughnut. Campbell stated that he told the man he was not hungry and that the man then said "something about sweets." According to Campbell, the entire exchange lasted between five and ten seconds.

Paschal and the other defendants moved to question the juror involved.

The trial judge denied their request, stating he believed the encounter was "a totally innocuous situation" and that to question the juror "would interrupt his proper deliberation." He also noted that in the Beaufort County Courthouse, where this case was tried, "the juryroom opens into the courtroom and ... the jury's point of entrance and exit from the courtroom is right by ... the plaintiff's table."

Contact between jurors and either parties or counsel during the trial of a case is always strongly discouraged. We recognize, however, that it is almost impossible to avoid brief and casual contact with jurors, particularly in crowded courthouses like the one in Beaufort County.

"[B]rief, public, and nonprejudicial conversations between jurors and parties or their relatives will not vitiate the verdict ... where the conversation was conceived in innocence and related to a matter entirely foreign to the case." *O'Berry v. Perry*, 266 N. C. 77, 145 S. E. (2d) 321 (1965), quoting 89 C.J.S. *Trial* § 457b at 83 (1955). Where juror misconduct is suspected, it is within the discretionary power of the trial court to decide whether to examine the juror. *See* 89 C.J.S. *Trial* § 461 at 91 (1955).

We cannot say that the trial judge in this instance abused his discretion in not interrogating the juror.

The trial judge conducted an adequate inquiry into the matter by questioning both Kelley and Campbell and by allowing them to be examined by counsel. Only after considering the attendant circumstances, the layout of the courtroom, the nature of the conversation, and, necessarily, the credibility of both witnesses did the trial judge find the encounter between Campbell and the juror to have been totally harmless. *See Sunset Acres Motel, Inc. v. Jacobs*, 336 S. W. (2d) 473 (Mo. 1960) (where the trial judge examined a juror on two separate occasions after reported incidences of contact between the juror and parties in the case the Missouri Supreme Court held that the trial judge did not abuse his discretion in denying motions for mistrial and suggested that the incidents were exaggerated by the scope of the investigation made and the initial questioning of the juror); *Hamilton v. Poe*, 473 S. W. (2d) 840 (Ky. App. 1971) (in the absence of any showing that matters pertaining to the case were discussed or that the communication was calculated to influence the jury, the trial judge did not err in not setting aside the swearing of the jury); *Landes v. Faella*, 106 R. I. 23, 255 A. (2d) 724 (1969) (a motion for a new trial based on alleged misconduct between a juror and one of the litigants or his attorney is addressed to the sound discretion of the trial judge); *Johnson v. Kolovos*, 224 Or. 266, 355 P. (2d) 1115 (1960) (the granting of a mistrial is within the discretion of the trial judge who is in a better position to "understand the circumstances surrounding the conversation, the nature of it, the physical conditions in the courthouse, and the effect of the conversation upon the case."); *but see Raybourn v. Howard*, 307 S. W. (2d) 206 (Ky. App. 1957) (where a juror allegedly solicited information privately from a witness the

court held that in determining whether the juror's misconduct had been prejudicial the trial judge should have examined the juror as well as the witness).

## V.

### A.

Paschal argues that the trial court erred in allowing Campbell, as he states in his brief, to "introduce" into evidence a letter from the Beaufort Naval Hospital to Campbell's commanding officer. Paschal contends that the letter constituted inadmissible hearsay and that it was not properly disclosed prior to trial in answer to interrogatories served pursuant to Rule 90 of the Circuit Court Rules.

Campbell presented the testimony of Major Carl Corby, once Campbell's immediate superior in the Motor Transport Division. Corby testified as to Campbell's potential in the Marine Corps, both before and after the accident. It was Corby's opinion that Campbell would be medically discharged from the Marine Corps as a result of the injuries Campbell received in the accident.

In response to a question from Campbell's attorney as to the most current information regarding Campbell's status, Corby testified that "[t]he command was informed by official correspondence from the Naval Hospital yesterday that Sergeant Campbell would be undergoing and proceeding [before] an evaluation board for probable disability" and that in his opinion this meant that Campbell would be discharged from the Marine Corps. At this point, Campbell's attorney proffered the hospital's letter for introduction into evidence.

Campbell's attorney withdrew his proffer of the document when counsel for the several defendants objected to its introduction; however, the trial judge had the letter marked as Court's Exhibit No. 3.

Because the record shows the letter was not received into evidence, we need not address Paschal's contentions that the trial court erred in allowing its introduction. *See Fender v. City of Jesup*, 124 Ga. App. 833, 186 S. E. (2d) 348 (1971) (the plaintiff held to have nothing to complain about where the plaintiff contended on appeal that the trial court erred in allowing certain evidence concerning contents of a contract and the record showed only an attempt to introduce the

contents into evidence and a refusal by the trial court to admit the document).

## B.

Paschal also complains that the trial court did not allow the witness through whom the letter was proffered to be cross-examined about the hospital's letter unless it was placed into evidence. He claims in his brief that the letter formed a basis for the witness' opinion that Campbell would be retired medically from the Marine Corps.

After Campbell's attorney, following the objection by Paschal's attorney to the letter, withdrew his proffer thereof, Paschal's attorney then objected to being unable to cross-examine Corby about the letter without it being in the record. The trial judge stated that he either would admit the letter on a motion by Paschal's attorney or would require Campbell to introduce the letter. Counsel for Paschal declined to follow either approach. He simply moved for a mistrial based upon Corby's testifying about a document not in evidence.

Even if the trial judge committed error in not allowing Paschal to cross-examine Corby without the letter being in evidence, the error at most was harmless. Corby's opinion regarding the probability of Campbell's being medically discharged from the Marine Corps was based, not on the letter, as Paschal contends, but on his own experience as a Marine Corps officer, his observations of Campbell, and his knowledge of Marine Corps physical requirements.

Even if the letter provided a basis for his opinion, Corby's testimony regarding the probability of Campbell's discharge from the Marine Corps was cumulative to other testimony that Campbell would be so discharged. Dr. Meade Luby, an orthopedic surgeon and Campbell's medical expert, also gave his opinion that Campbell would be medically discharged from the Marine Corps. Luby viewed Campbell as completely unable to perform his duties "as a combat ready career Marine." *See Hilton Head Island Realty. Inc. v. Skull Creek Club*, 287 S. C. 527, 339 S. E. (2d) 890 (Ct. App. 1986) (reversal is not warranted where evidence erroneously admitted is merely cumulative).

## C.

Paschal also includes an exception regarding the trial court's failure to grant a mistrial and an exception relating to the trial judge's failure to instruct the jury to disregard Corby's testimony about the letter.

Paschal nowhere in his brief, as he purports to do under the heading of his argument relating to the trial court's handling of the letter, argues the exception regarding the trial court's failure to grant him a mistrial. He likewise does not argue in his brief the failure of the trial court to give the jury a curative instruction. We therefore do not consider these two exceptions. *See Nelson v. Merritt*, 281 S. C. 126, 314 S. E. (2d) 840 (Ct. App. 1984) (an exception not argued is deemed abandoned).

## VI.

Paschal also maintains that the trial judge erred in charging the jury that "one operating a motor vehicle on the public highways owes an urgent duty to keep a proper lookout. . . ." Paschal complains about the trial judge's use of the word "urgent."

We hold, however, that the trial judge's charge to the jury accurately stated the law regarding the duty to keep a proper lookout. The use of the word "urgent," while not necessary to the charge, was not a misstatement of the law. The language used by the trial judge is exactly the same as that used by the Supreme Court in *Yaun v. Baldridge*, 243 S. C. 414, 134 S. E. (2d) 248 (1964).

## VII.

Paschal contends the trial court's submission to the jury of Campbell's future medical expenses constituted error because there was insufficient evidence in the record to warrant its consideration.

Campbell seriously injured his left leg in the accident. His injuries required surgery and skin grafting. Campbell's leg remains tender today. His left leg, badly scarred from his injuries, is approximately one inch shorter than his right one. Campbell testified that his position as Assistant Chief of Operations of the Motor Transport Division involves a lot of walking and prolonged standing and, as a consequence,

his job is much more difficult for him now than before the accident.

Luby, the orthopedic surgeon who treated Campbell, testified that Campbell suffers a forty percent permanent disability to his lower leg as a result of his injuries. In Luby's opinion, Campbell will be more prone to circulation problems in his leg because of the extensive scarring and the destruction of veins. The grafted skin area is at particularly high risk, especially for an active person.

To recover for future medical expenses, the expenses must be established with reasonable certainty. *Winchester v. United Insurance Co.*, 231 S. C. 462, 99 S. E. (2d) 28 (1957); *Haselden v. Atlantic Coast Line R. Co.*, 214 S. C. 410, 53 S. E. (2d) 60 (1949), *cert. denied*, 338 U. S. 825, 70 S. Ct. 73, 94 L. Ed. 501 (1949); *see also* 25 C.J.S. *Damages* § 31 at 695 (1966). A party need not, however, prove future damages in a personal injury case to a mathematical certainty. *Hall v. Palmetto Enterprises II, Inc., of Clinton*, 282 S. C. 87, 317 S. E. (2d) 140 (Ct. App. 1984).

Evidence that Campbell, who was 22 years old at the time of the accident, suffers recurring pain and tenderness in his leg and is likely to suffer circulation problems in the future is sufficient, in our view, to sustain an award involving future damages. *Id.*

## VIII.

Paschal directs two complaints at the expert testimony of Dr. B. F. Kiker, Chairman of the Department of Economics at the University of South Carolina, concerning Campbell's economic losses resulting from the injuries he received in the accident.

## A.

He first contends the trial judge improperly took judicial notice of certain official publications used by Kiker in forming his expert opinion. This contention lacks merit.

Campbell's counsel asked Kiker to state his opinion as to the economic loss Campbell suffered as a result of the injuries he received on August 30, 1981. Paschal's attorney immediately objected, claiming that Kiker was being asked to

base his opinion on "facts that ha[d] been furnished" to him. Specifically, Paschal's attorney complained about Kiker's use of economic and statistical data collected by him from various government documents. The information consisted of such things as work life expectancies, wage growth rates, interest rate trends, income tax rates, and the like. The documents originated with the United States Department of Labor, the Internal Revenue Service, the South Carolina Employment Security Commission, the Veteran's Administration, and the Federal Reserve System.

Out of the presence of the jury, the trial judge took judicial notice that the government publications used by Kiker, such as those published by the Internal Revenue Service, "are accurate." The trial judge then ruled that Kiker was "qualified to assimilate and ... use the data of ... state and federal publications ... that he has examined and, in his opinion, is correct ... [and] that is normally used in the scope of an economist's projection." The trial judge never, as Paschal claims he did, took judicial notice of the data contained in the publications.

We have recently heard that expert testimony may be based partially on information received from other sources if such facts and data are "of type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." *Howle v. PYA/Monarch, Inc.*, 288 S. C. 586, 344 S. E. (2d) 157 (Ct. App. 1986).

Kiker's testimony clearly falls into this category. The economic and statistical data used by him is clearly of the kind relied on by economists seeking to project economic loss. *See Good v. A. B. Chance Co.*, 39 Colo. App. 70, 565 P. (2d) 217 (1977) (where trial court held not to have erred in allowing an economist testifying as an expert to base his testimony on charts prepared from statistics contained in official publications not in evidence).

The trial judge, therefore, properly allowed Kiker to base his opinion on the information contained in official publications but not in evidence. *See Tiffany v. Christman Co.*, 93 Mich. App. 267, 287 N. W. (2d) 199 (1980) (where court held it was permissible for expert witness in a personal injury action involving future loss of wages to base his opinion on wage trends, work life expectancy, and other similar data not of record).

## B.

Paschal further contends that the trial judge improperly allowed Kiker to base his expert opinion on the assumption that Campbell, had he not been injured, would have been promoted to higher pay grades before his discharge because there is no evidence in the record establishing when Campbell would have received future promotions. This contention also lacks merit.

Campbell's pay grade at the time of the accident, the record shows, was E-6. Kiker's calculations simply assumed Campbell ultimately would have reached the E-9 pay grade before he retired from the Marine Corps. In determining Campbell's future earnings, Kiker did not base his opinion on any evidence showing when Campbell would have actually been promoted to higher pay grades. Instead, he based them on when Campbell would have been promoted to those grades using time in grade and nothing more.

Paschal makes no contention that the record is deficient as to when Campbell should have reached the pay grades of E-7, E-8 and E-9 based simply on time in grade.

The facts used in a hypothetical question presented to an expert witness must have some evidentiary support. *Young v. Tide Craft, Inc.*, 270 S. C. 453, 242 S. E. (2d) 671 (1978); *Brown v. La France Industries*, 286 S. C. 319, 333 S. E. (2d) 348 (Ct. App. 1985).

Corby, Campbell's former superior officer, testified that Campbell's military evaluations, before the accident, were rated excellent to outstanding. Corby further testified that, had Campbell not been hurt, Campbell would probably have risen to the rank of Master Gunnery Sergeant during the course of his military career, a rank carrying the pay grade of E-9.

These facts, all of which appear in the record, are sufficient to support the assumptions made by Kiker in forming his opinion regarding Campbell's future promotions, particularly since Paschal does not question Kiker's use of time in grade in determining Campbell's future promotions but complains about the lack of testimony in the record as to when Campbell would have actually received any future promotions.

Indeed, Kiker's use of time in grade to predict Campbell's promotions and thus his future earnings was favorable to

Paschal since promotions based on merit, quite obviously, would have placed Campbell in higher pay scales at earlier times.

## IX.

Paschal appeals the failure of the trial judge to instruct the jury concerning certain federal statutes of which he took judicial notice.

During Kiker's cross-examination, Paschal's attorney asked the trial judge to take judicial notice of certain federal statutes giving employment preferences in civil service to disabled veterans. The trial judge took judicial notice of these statutes and ordered them compiled and entered as a court's exhibit. The record shows the exhibit consists of over 39 pages machine-copied from the United States Code.

As we gather from the record, Paschal later submitted to the trial judge eighteen separate written requests to charge based upon these federal code sections. The trial judge ruled that the federal statutes, "if relevant," could be argued to the jury but that he would not include them in his charge because the requests were too fact oriented and because, in any case, his damage charge accurately stated South Carolina law.

Paschal argues that this ruling was error.

He does not include in the record, however, the eighteen requests that he desired the trial judge to charge and that he now wants us to review.

Because the contents of the requests to charge are not contained in the record, we cannot review the requests to determine whether the issues made by the pleadings and supported by the evidence warranted the trial judge charging them. *Kline Iron & Steel Co. v. Superior Trucking Co.*, 261 S. C. 542, 201 S. E. (2d) 388 (1973); *Porter Brothers, Inc. v. Specialty Welding Company*, 286 S. C. 39, 331 S. E. (2d) 783 (Ct. App. 1985). *See also Baker v. Weaver*, 279 S. C. 479, 309 S. E. (2d) 770 (Ct. App. 1983) (instructions to the jury should be confined to the issues made by the pleadings and supported by the evidence).

We therefore do not reach this issue.

## X.

Finally, Paschal maintains that the trial judge erred in allowing Luby and Corby to testify that Campbell would most probably be medically discharged from the Marine Corps because of the injuries he received in the accident. Paschal questions Luby's and Corby's qualifications to express their opinions.

Generally, the qualification of a witness as an expert ██ ██ is a matter within the discretion of the trial judge. *Madden v. Cox*, 284 S. C. 574, 328 S. E. (2d) 108 (Ct. App. 1985), *petition for cert. dismissed*, 286 S. C. 127, 332 S. E. (2d) 102 (1985). To be competent as an expert, a witness by reason of study or experience or both must possess such knowledge or skill in a business, profession, or science that he is better qualified than the jury to form an opinion on the particular subject of his testimony. *Howle v. PYA, supra; Botehlo v. Bycura*, 282 S. C. 578, 320 S. E. (2d) 59 (Ct. App. 1984).

Luby, who practiced at a military hospital and was, as ██ we mentioned, Campbell's orthopedic surgeon, participated in over a hundred medical board reviews for injured Marines. This experience, plus Luby's medical expertise and training as a physician treating military personnel, qualified him to give an opinion as to the probability of Campbell's discharge.

Similarly, Corby's knowledge of Campbell and his ██ injuries and Corby's extensive military experience gained in 24 years of service in the Marine Corps qualified him also to express an opinion concerning the likelihood of the Marine Corps retaining Campbell in its service.

While the final decision as to whether a Marine will ██ be medically discharged rests with the Departmental Review Board of the Department of the Navy, this fact, contrary to Paschal's argument, provides no basis for not admitting Luby's and Corby's opinions. It merely goes to the probative value of their opinions, a matter for the jury's determination. *See Smoak v. Liebherr-America, Inc.*, 281 S. C. 420, 315 S. E. (2d) 116 (1984) (where expert's opinion rests on sufficient factual foundation, it is within the province of the jury to determine its probative value).

The trial judge, therefore, committed no abuse of discretion in allowing the opinion evidence given by Luby and Corby concerning the probability of Campbell's discharge from the Marines.

Accordingly, the judgment below is

Affirmed.

GARDNER and CURETON, JJ., concur.