24377

Barbara WATERS and Foster Johnson, Appellants v. SOUTH CAROLINA LAND RESOURCES CONSERVATION COMMISSION and J. M. Huber Corporation, Respondents.

(467 S.E. (2d) 913)

Supreme Court

*D. Cravens Ravenel* and *Virginia C. Ravenel, Baker, Barwick, Ravenel & Bender, L.L.P.,* Columbia, *for appellants.*

*Carlisle Roberts, Jr.* and *Walton J. McLeod, III,* Columbia, *for respondent South Carolina Land Resources Conservation Commission.*

*William C. Boyd, Sue C. Erwin,* and *Deborah P. Morgan, Sinkler & Boyd, P.A.,* Columbia, *for respondent J.M. Huber Corporation.*

Heard Nov. 14, 1995.

Filed Mar. 4, 1996.

WALLER, Justice:

South Carolina Land Resources Conservation Commission ("SCLRCC") granted J.M. Huber Corporation ("Huber") a permit to mine kaolin[1] in Lexington County. The South Car-

---

[1] Kaolin is a fine clay used in ceramics and refractories and as a filler or coating for paper and textiles. American Heritage Dictionary 697 (2d. ed. 1982).

olina Mining Council affirmed SCLRCC's decision. Appellants then filed a complaint in circuit court seeking review of the Mining Council order. This appeal is from the circuit court's order upholding the decision of SCLRCC and the Mining Council to grant the permit. We affirm.

## ISSUES

I.  Was there sufficient evidence to support SCLRCC's decision?

II. Does the modification scheme under the South Carolina Mining Act violate procedural due process?

## DISCUSSION

### I. *Evidentiary Issue*

Appellants reside in the Batesburg-Leesville area of Lexington County, in close proximity to the mining site. When Huber's "Intent to Mine" notice was published, appellants objected to the permit being granted. They are concerned the mining operation will have adverse effects on the environment, particularly in that it will increase the level of radioactive material in the water leaving the site. This water, a shallow aquifer system, flows on top of the kaolin into a creek, the source of appellants' water supply, which comes from private wells. However, there is another underground water system running below the kaolin. Appellants' concern is that if there is radioactive material in the water below the kaolin, removing the kaolin will allow it to mix with the water above, thus increasing the latter's level of radioactivity.

Under the South Carolina Mining Act,[2] an operating permit must be granted unless the department[3] makes one of seven statutory findings. S.C. Code Ann. § 48-20-70 (Supp. 1994). The two findings involved in this appeal are (1) the operation will have undue adverse effects on wildlife or freshwater, estuarine, or marine fisheries; and (2) the operation will violate standards of air quality, surface water quality, or groundwater quality which have been promulgated by the South Carolina

---

[2] S.C. Code Ann. §§ 48-20-10 to -310 (Supp. 1994).

[3] "Department" is currently the South Carolina Department of Health and Environmental Control due to government restructuring. *See* S.C. Code Ann. § 48-20-40(3) (Supp. 1994). However, at the time of Huber's application (July 6, 1992), the department was SCLRCC.

Department of Health and Environmental Control. S.C. Code Ann. §§ 48-20-70(2), -70(3) (Supp. 1994). If appellants' concerns are warranted, it might require one of the above statutory findings.

After hearing their objections, SCLRCC issued its Summary Report concluding appellants' fears were unfounded. The Mining Council agreed after a full evidentiary hearing. In its findings of fact it stated:

> On the issue of whether the mining operation might cause the presence of radioactive elements in the area's groundwater, Kennedy [a geologist with SCLRCC] testified that there was naturally occurring uranium in the area. The SCLRCC Summary Report indicated that there were varying concentrations of minerals bearing uranium and thorium throughout this section of the state.
>
> However, although conceding that he was not an expert on the subject of the migration of radioactive elements, Kennedy stated that the probability of contamination of drinking water caused by the penetration of the natural barrier beneath the kaolin is very low. The unrebutted testimony was to the effect that the anticipated level of radioactivity in the underlying granitic material is significantly less than that found in the blaney sand aquifer which is the source of drinking water for approximately 140 wells within a one-mile radius of the permitted area. In addition, the SCLRCC Summary Report indicated that the mine operation would not cause an increase in the level of radioactivity.

Appellants argue there was an absence of case-specific evidence and expert testimony regarding this issue at the Mining Council hearing, thus necessitating a finding that the Council's decision was unsupported by evidence. We disagree. The evidence in the record may be fairly summarized as follows.

The Summary Report contained a section entitled "Radiologic Concerns in Groundwater." It recognized the existence of naturally occurring concentrations of minerals bearing Uranium and Thorium throughout the permit area. When these elements decay, they produce radioactive "daughter" elements. Under certain circumstances, both parent and daughter elements can leak out into groundwater. Clay minerals (in-

cluding kaolinite) serve to lower the concentration of Uranium cations in groundwater. Thus the concern is that removal of the kaolin will directly result in an increase of Uranium cations in the groundwater.

The report listed three reasons why granting the permit would not cause the radioactive levels to increase. First, other clay materials would still remain on site that are better at capturing the Uranium cations than kaolinite, and in any event, standard mining procedure leaves a layer of kaolin in the bottom of the pit, so it will not be completely gone. Second, any dissolved solids (i.e. radioactive materials) in the groundwater are most likely derived locally because the shallow aquifer system on the site is isolated; thus mining will not result in any radioactive materials coming in from the outside. Finally, there is no risk of contaminating Marlowe Creek (which might have a connection to appellants' wells) because water pumped out of the mining pit is not discharged into the creek; it is pumped into a percolation basin and allowed to naturally disburse. Handling the pit water through the percolation basin minimizes exposure of any dissolved solids in the groundwater because it quickly returns them to natural conditions. The Summary Report also noted the mine site was located down gradient from well water users, and the operation proposed only to penetrate the shallow aquifer.

The Mining Council relied almost exclusively on the testimony of Craig Kennedy, Assistant Director of the Division of Mining and Reclamation for SCLRCC. While he admitted he was not an expert in the field of radioactive mineral migration through hydrologic systems, he had worked for SCLRCC as a geologist for sixteen years.[4] He partially relied on a Ph.D. dissertation and a government report in making this conclusions. *See* Jacqueline Michel, Mobilization

---

[4] Kennedy's admitting he was not an expert in this particular geological field does not render him incompetent to testify as an expert witness. *See, e.g., Creed v. City of Columbia,* 310 S.C. 342, 426 S.E. (2d) 785 (1993) (physician not incompetent to testify as an expert merely because he is not a specialist in the particular field involved in the case; lack of specialty should, however, be considered in weighing the testimony given); *Campbell v. Paschal,* 290 S.C. 1, 19, 347 S.E. (2d) 892, 903 (Ct. App. 1986) ("[t]to be competent as an expert, a witness by reason of study or experience or both must possess such knowledge or skill in a business, profession, or science that he is better qualified than the [finder of fact] to form an opinion on the particular subject of his testimony").

of Uranium and Thorium Decay Series Isotopes in the Hydrologic Cycle (1980) (Ph.D. dissertation, University of South Carolina); P.L. Jones, Hydrogeochemical and Stream Sediment Reconnaissance (1979) (Data Release Prepared for U.S. Department of Energy, National Uranium Resource Evaluation Program). Both of these studies involved the Batesburg-Leesville area. They were both admitted into evidence at the Mining Council hearing.

Kennedy testified there is more potential for the radioactive cations to be in the water above the kaolin than under it. However, he assumed radioactive elements existed in the water beneath the kaolin. The likelihood of this water being tapped was minimal because miners leave a layer of kaolin in the bottom of the mining pit. Nonetheless, even if all of the kaolin was mined out and the hard rock beneath the kaolin was penetrated, the water beneath the kaolin bed would not migrate upward because it is not part of an aquifer system. The two water systems are completely separate. Because the hard rock underneath the Kaolin is granite, even if the water has radioactive material in it, no water could flow through except through fractures. Kennedy testified water would not be flowing through such fractures readily. Even assuming the water under the kaolin did contain radioactive material that was somehow able to mix with the water above the kaolin, it would never make it into the private wells. Water leaving the mining site migrates into Marlowe Creek. It has to flow through wetlands to reach the creek. These wetlands contain carbonatious material, which acts as a cleansing agent for any radio nucleic materials in the water.

Kennedy concluded the water underneath the kaolin was not part of an aquifer system after walking the mine site. In his opinion it showed no signs of being one based on the location of the site. He based his conclusion that granite composed the hard rock underneath the kaolin on his observations of the mine site. In particular, he observed granite float material and granite water deposits. Furthermore, there were no rock outcroppings other than granite on the site.

Mark Williams, a hydrogeologist, testified no radioactive material would filter out of the mine and into the groundwater of the private wells based on the flow characteristics of the discharging groundwater from the mine. To his knowledge

there were no drinking water standards promulgated by DHEC for private wells.

This court's review of an administrative agency's findings of fact are limited. The court "shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact." S.C. Code Ann. § 1-23-380(A)(6) (Supp. 1994). A court can reverse an agency's findings, inferences, conclusions or decisions only if they are, as appellants here argue, "clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record," or "arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion." S.C. Code Ann. §§ 1-23-380(A)(6)(e), -380(6)(f) (Supp. 1994).

"Substantial evidence is not a mere scintilla of evidence nor evidence viewed blindly from one side, but is evidence which, when considering the record as a whole, would allow reasonable minds to reach the conclusion that the agency reached." *Palmetto Alliance, Inc. v. South Carolina Pub. Serv. Comm'n*, 282 S.C. 430, 432, 319 S.E. (2d) 695, 696 (1984). The possibility of drawing two inconsistent conclusions from the evidence will not mean the agency's conclusion was unsupported by substantial evidence. *Id.* Furthermore, the burden is on appellants to prove convincingly that the agency's decision is unsupported by the evidence. *See Hamm v. AT&T*, 302 S.C. 210, 394 S.E. (2d) 842 (1990).

Applying these principles to the instant case, we find the record contained "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" that Huber's mining operation would not cause an increase in the radioactive level of the water supply. *South Carolina Dep't of Mental Retardation v. Glenn*, 291 S.C. 279, 281, 353 S.E. (2d) 284, 286 (1987). The fact that Kennedy relied on circumstantial rather than direct evidence in forming his conclusions goes to the weight of the evidence. *See Bilton v. Best Western Royal Motor Lodge*, 282 S.C. 634, 321 S.E. (2d) 63 (Ct. App. 1984) (circumstantial evidence and inferences drawn therefrom may be relied on to support a finding of fact of an administrative agency); *see also Palmetto Alliance, Inc.*, 282 S.C. at 433, 319 S.E. (2d) at 697 (an agency's findings cannot be overturned "unless there is no reasonable probability that the facts could be as related by [the] witness upon whose

testimony the finding is based").[5] Thus, the agency's decision was neither arbitrary, capricious, nor characterized by an abuse of discretion. *See Fontaine v. Peitz,* 291 S.C. 536, 354 S.E. (2d) 565 (1987) (an abuse of discretion occurs when a factual ruling is without evidentiary support).[6]

## II. *Procedural Due Process*

Appellants also challenge the modification scheme of the South Carolina Mining Act. The act allows an operator mining under a permit to apply for a modification. Modifications can affect any terms or conditions of the existing permit, including the amount of land covered. Specifically, any permit can be modified to include land neighboring the affected or permitted land. S.C. Code Ann. § 48-20-80 (Supp. 1994). However, public notice is only required when the modification requested is deemed substantial by the department. S.C. Code Ann. § 48-20-70 (Supp. 1994). No statute or regulation defines a substantial modification.

Huber owns leasehold rights to mine kaolin on between four and five hundred acres that would be considered "neighboring" the land permitted by the current permit. Appellants claim the act violates procedural due process because Huber could apply to modify its existing permit to include this additional acreage and there is no statutory guarantee they will get notice of it.

Appellants' constitutional claim is not ripe for determination at this time. "A justiciable controversy is a real and substantial controversy which is ripe and appropriate for judicial determination, as distinguished from a contingent, hypothetical or abstract dispute." *Pee Dee Elec. Coop., Inc. v. Carolina Power & Light Co.,* 279 S.C. 64, 66, 301 S.E. (2d) 761, 762 (1983). *See also Hitter v. McLeod,* 274 S.C. 616, 266 S.E. (2d) 418 (1980). In determining a ripeness issue under the "case or controversy" requirement of Article III of the United States Constitution, federal courts use a two-factor test: (1) the fitness of the issues for judicial decision, and (2) the hardship to

---

[5] *Cf. Vesta Mining Co. v. Department of Envtl. Resources,* 164 Pa. Cmwlth. 144, 642 A. (2d) 568 (1994) (finding expert's testimony regarding aquatic life in a particular stream was substantial evidence even though he did not personally examine the stream but relied on data submitted by other witnesses).

[6] We reject appellants' argument that SCLRCC was deficient in failing to conduct a study of an additional four to five hundred acres nearby in which Huber holds leasehold rights to mine. The Mining Act only requires a study of the land included in the permit application.

the parties of withholding court consideration. *Fort Sumter Tours, Inc. v. Andrus*, 564 F. (2d) 1119 (4th Cir. 1977) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed. (2d) 681 (1967); *Thrifty Rent-A-Car Sys., Inc. v. Thrifty Auto Sales of Charleston, Inc.*, 849 F. Supp 1083, 1085-86 (D.S.C. 1991) (stating additionally that a "court should not decide a controversy grounded in uncertain and contingent events that may not occur as anticipated or may not occur at all").

Huber has not applied for a modification, nor is there any indication it ever will. It is not required to do so under the statute in order to gain permission to mine the neighboring land. *See* S.C. Ann. § 48-20-80 (Supp. 1994) ("In lieu of a modification, an operator may apply for a new permit in the manner prescribed by Sections 48-20-60 and 48-20-70"); *Power v. McNair*, 355 S.C. 150, 154, 177 S.E. (2d) 551, 553 (1970) (suit against governor seeking state constable appointment not ripe because "such appointment has not [yet] been made and there is nothing in the record to bind the Governor to do so, even if we were to hold that such action would not violate the constitutional provision in question"). Even if Huber did apply for a modification, there is no way to determine the content of it (e.g. how much land it would seek to add), and thus whether in any event notice would be given according to the statute. The mere act of applying to modify will not in any of itself violate appellants' constitutional rights. "It is not enough that a threat of *possible* injury currently exists; the mere threat of potential injury is too contingent or remote to support present adjudication." *Thrifty Rent-A-Car Systems, Inc.*, 849 F. Supp. at 1086.

After the hearing, the Mining Council amended the permit to provide that appellants would receive notice of any application for modification made by Huber. Therefore, no hardship to appellants will result from withholding court consideration because there is no chance of any modification being allowed without them being aware of it.[7]

---

[7] Appellants' attempt to label the action as one for declaratory judgment does not alter this analysis. Declaratory judgment actions must involve an actual, justiciable controversy that is ripe for determination. *Southern Bank & Trust Co. v. Harrison Sales Co.*, 285 S.C. 50, 328 S.E. (2d) 66 (1985). While some jurisdictions have made exceptions in declaratory judgment actions where the "ripening seeds" of an actual controversy exist, we decline to utilize such exception here because the facts do not indicate an imminent violation of rights. *See Boyds Civic Ass'n v. Montgomery County Council*, 309 Md. 683, 526 A. (2d) 598 (Md. 1987).

## CONCLUSION

We find the evidence admitted into the record and considered by the South Carolina Mining Council is sufficient to support their conclusions under the substantial evidence test of the Administrative Procedures Act. We decline to address the merits of appellants' constitutional challenge until it is ripe for judicial determination.

Accordingly, the order of the circuit court is

Affirmed.

FINNEY, C.J., MOORE and BURNETT, JJ., and KAYE G. HEARN, Acting Associate Justice, concur.