UNITED STATES of America, Appellee,

v.

**Michael W. BESHORE, Appellant.**

UNITED STATES of America, Appellee,

v.

**David M. RUSSELL, Appellant.**

**Nos. 91–2431, 91–2434.**

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 11, 1991.

Decided April 20, 1992.

Rehearing Denied June 9, 1992.

Larry Curtis Pace, Kansas City, Mo., argued for Michael W. Beshore.

Mark C. Kuhls, Kansas City, Mo., argued for David M. Russell.

D. Michael Green, Kansas City, Mo., argued and on brief (Jean Paul Bradshaw on brief), for the U.S.

Before McMILLIAN, Circuit Judge, BRIGHT, Senior Circuit Judge, and JOHN R. GIBSON, Circuit Judge.

McMILLIAN, Circuit Judge.

Michael W. Beshore and David M. Russell (defendants) appeal from final judgments entered in the United States District Court[1] for the Western District of Missouri, upon a jury verdict, finding them guilty of one count of attempting to manufacture methamphetamine in violation of 21 U.S.C. §§ 841(b)(1)(A), 846. Beshore was sentenced to 137 months imprisonment, five years supervised release, and a special assessment of $50.00. Russell was sentenced to 150 months imprisonment, five years supervised release, and a special assessment of $50.00. For reversal, defendants argue that the district court erred in (1) denying their motion for a mistrial when the government played the wrong tape recording for the jury, (2) not suppressing the evidence seized from a search of Beshore's car, and (3) calculating defendants' base offense level on the basis of precursor chemicals. For the reasons discussed below, we affirm the judgments of the district court.

FACTS

As part of an undercover operation, Missouri State Highway Patrol Trooper James Wingo began buying methamphetamine from a man named Robert William Atchison. Atchison told Trooper Wingo about a man named Beshore that was trying to establish a methamphetamine laboratory in the Kansas City, Missouri, area. During the summer of 1990, Trooper Wingo had discussions with Beshore about setting up a methamphetamine laboratory. They discussed the type of equipment that would be needed and Beshore told Trooper Wingo that he wanted to do an "ephedrine and red phosphorus cook" because it did not produce a strong smell. Beshore also suggested doing a "40-hour" cook to produce five-and-a-half pounds of methamphetamine. On July 30, 1990, Trooper Wingo, following Beshore's instructions, ordered precursor chemicals.

Trooper Wingo arranged for Trooper Clyde Townsend to act as a middleman between himself and defendants. On August 9, 1990, Beshore told Trooper Wingo that he and his partner, Russell, were ready to set up the laboratory that weekend. On August 11, 1990, Trooper Townsend and another undercover officer met Beshore and Russell in a farmhouse in Harrisonville, Missouri. At that meeting they discussed the laboratory. Later that day, Beshore and Russell showed Trooper Townsend various items for use in the methamphetamine laboratory. These items were stored in the car driven by defendants.

On the evening of August 11, 1990, a Raytown police officer stopped a white Ford being driven by Pamela Wilson, Beshore's girlfriend. This stop was completely unrelated to the undercover operation being conducted by the Missouri Highway Patrol. Wilson consented to a search of the car and laboratory equipment and precursor chemicals were found. Trooper Townsend identified these items as the same ones which defendants had shown him earlier in the day.

On August 13, 1990, Beshore told Trooper Wingo that his equipment had been taken by the police. Over the next week, Beshore and Trooper Wingo discussed setting up the laboratory during the weekend of August 24. It was agreed that Trooper Wingo would supply the precursor chemicals and receive half of the anticipated five-pound methamphetamine yield. Beshore and Russell, who would set up the laboratory at the motel and do the cooking, would receive the other half. Surveillance was set up at the motel. Trooper Wingo placed the equipment and precursor chemicals Beshore had requested in the truck of Trooper Townsend's car.

On August 24, 1990, Trooper Townsend met Beshore at a gas station next to the motel. They then went to the motel room and were joined by Russell. They set up a laboratory in the bathroom with equipment obtained by Beshore and Russell. Russell showed Trooper Townsend a recipe for making methamphetamine. Trooper Townsend and defendants then went out to Trooper Townsend's car and picked up the

1. The Honorable Dean Whipple, United States District Judge for Western District of Missouri.

boxes of equipment and precursor chemicals. When they re-entered the motel room, Beshore and Russell were arrested.

DISCUSSION

### Denial of Mistrial for Playing of Wrong Tape Recording

■ During Trooper Wingo's testimony on the first day of trial, the government played a tape recording of what it believed was a conversation between Trooper Wingo and Beshore. The tape was actually a conversation between Trooper Wingo and Atchison, an unindicted co-conspirator. When the error was discovered, defense counsel objected and the jurors were instructed to remove their headsets. While the attorneys held a bench conference, the tape continued to play although the jurors had removed their headsets. Finally, the tape was stopped. Defendants moved for a mistrial, but their motion was denied. The district court stated that the jurors had removed their headsets and it did not know if the jury could make any sense out of what was being played on the tape recorder.

Beshore and Russell argue that the district court abused its discretion in denying their motion for a mistrial because the tape was hearsay and had not been previously disclosed to the defense.

The government argues that there was no bad faith on its part and at no time during the rest of the trial was this tape referred to in any way. Additionally, the government argues that the district court found that the tape was played only briefly and was largely unintelligible, and thus created no prejudice. The conversation did not refer to either defendant; therefore, the government argues that there was no prejudice to defendants.

■ The decision to grant or deny a motion for a mistrial is within the discretion of the district court and this court will only reverse upon a showing of an abuse of discretion. *United States v. Powell,* 771 F.2d 1173, 1175 (8th Cir.1985) (citation omitted).

We find no abuse of discretion. In *United States v. Drew,* 894 F.2d 965, 972–73 (8th Cir.) (*Drew*), cert. denied, 494 U.S. 1089, 110 S.Ct. 1830, 108 L.Ed.2d 959 (1990), this court found no abuse of discretion when the district court refused to grant a mistrial after a tape referring to the defendant's prior incarceration was inadvertently played for the jury twice. In the present case, the tape was only played for a short period of time and the district court found the words largely unintelligible. The portion of the misplayed tape did not even mention either defendant, as the tape did in *Drew,* and thus it does not appear that either defendant was prejudiced by the inadvertent playing of the wrong tape.

### Search of Beshore's Car

■ Beshore claims that invalid consent was given for the warrantless search of his car on August 11, 1990. Beshore argues that his girlfriend's consent to the search was insufficient.

The magistrate and the district court found valid consent. The government argues that valid third-party consent was obtained from Pamela Wilson, Beshore's girlfriend. The government argues that while the car was owned by Beshore, Beshore had given Wilson permission to use the car and Wilson's license plates were on the car.

■ Third-party consent is valid when "permission to search was obtained from a third-party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." *United States v. Matlock,* 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974) (*Matlock*) (footnote omitted); *see United States v. Wade,* 740 F.2d 625, 629 (8th Cir.1984) (*Wade*); *Marvin v. United States,* 732 F.2d 669, 675 (8th Cir.1984). It does not matter that Wilson was not the owner of the car which was searched; common authority is sufficient. *Wade,* 740 F.2d at 629. Wilson, by having Beshore's permission to use the car and putting her license plates on the vehicle, had common authority over the vehicle. Beshore thus assumed the risk that Wilson would permit the vehicle to be searched. *See Matlock,* 415 U.S. at 171 n. 7, 94 S.Ct. at 993 n. 7.

The district court did not abuse its discretion in finding that Wilson had common authority over the car and therefore gave valid consent to the search.

### Calculation of Base Offense Level

The district court found that the precursor chemicals possessed by defendants could have produced 226.8 grams of methamphetamine, which resulted in a base offense level of 26. It is not disputed that no methamphetamine was produced by defendants' laboratory. Defendants argue that they could not have actually produced any methamphetamine because a necessary precursor chemical, hydriodic acid, was never removed from Trooper Townsend's car. Defendants also argue that there was insufficient evidence to determine the amount of methamphetamine they could have produced because no evidence regarding prices or financial or similar transactions was introduced.

Calculation of amount of methamphetamine that could have been produced from the quantity of precursor chemicals is proper under the sentencing guidelines. The sentencing guidelines state that "[i]f a defendant is convicted of a conspiracy or an attempt to commit any offense involving a controlled substance, the offense level shall be the same as if the object of the conspiracy or attempt had been completed." U.S.S.G. § 2D1.4 (1990). The government argues that the district court correctly approximated the amount of methamphetamine the laboratory could have produced using the quantity of precursor chemicals and the size of the laboratory.

We agree. The government presented evidence as to the quantity of precursor chemicals possessed by defendants. A Drug Enforcement Administration (DEA) chemist who inspected the laboratory setup in the motel room testified that defendants could have produced 400 grams of methamphetamine using the precursor chemicals that were present. The presentence report determined that defendants had sufficient precursor chemicals to produce 226.8 grams of methamphetamine. The district court, using the presentence report, found defendants responsible for 226.8 grams. This DEA chemist also testified that defendants had a valid recipe to "cook" methamphetamine. The district court correctly followed U.S.S.G. § 2D1.4 by using the amount of precursor chemicals found to approximate the amount the methamphetamine defendants were capable of producing. *See United States v. Evans,* 891 F.2d 686, 687 (8th Cir.1989), *cert. denied,* 495 U.S. 931, 110 S.Ct. 2170, 109 L.Ed.2d 499 (1990); *United States v. Wagner,* 884 F.2d 1090, 1097–98 (8th Cir.1989), *cert. denied,* 494 U.S. 1088, 110 S.Ct. 1829, 108 L.Ed.2d 958 (1990).

Even in the absence of a necessary precursor chemical the district court could properly approximate the amount of controlled substance that could have been produced. The commentary to the sentencing guidelines state that "[w]here there is no drug seizure or the amount seized does not reflect the scale of the offense, the sentencing judge shall approximate the quantity of the controlled substance." U.S.S.G. § 2D1.4, note 2 (1990). This approximation does not require that every precursor chemical be present. As the Tenth Circuit explained in *United States v. Havens,* 910 F.2d 703, 705 (10th Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 687, 112 L.Ed.2d 678 (1991), "the trial court, upon proper testimony, may estimate the ultimate quantity of produceable drugs. This estimate should be equal to the amount of drugs produceable if the precursor chemicals possessed by the defendant were combined with proportionate amounts of the missing ingredients including processing equipment." We agree with the Tenth Circuit. *See also United States v. Short,* 947 F.2d 1445, 1457 (10th Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 1680, 118 L.Ed.2d 397 (1992); *United States v. Andersen,* 940 F.2d 593, 597–98 (10th Cir. 1991). The fact that the hydriodic acid had not yet been removed from Trooper Townsend's car does not mean that the district court cannot estimate the quantity of methamphetamine capable of being produced if defendants had possessed the hydriodic acid. Defendants were attempting to manufacture methamphetamine and the district

court correctly estimated the amount of methamphetamine that was the object of their attempt, that is, the amount they would have produced had their attempt been successful. *See United States v. Kingston,* 922 F.2d 1234, 1238 (6th Cir. 1990), *cert. denied,* — U.S. —, 111 S.Ct. 2054, 114 L.Ed.2d 460 (1991). We find no error in the district court's determination of defendants' base offense level.

CONCLUSION

Accordingly, the judgments of the district court are affirmed.