William E. **CHAMBERS** and Beverly Chambers, Plaintiffs,

v.

**OSTEONICS CORPORATION,** Defendant.

No. IP 93–1060–C M/S.

United States District Court, S.D. Indiana, Indianapolis Division.

Feb. 26, 1996.

F. Boyd Hovde, Townsend Hovde & Montross, Indianapolis, Indiana, for Plaintiffs.

William P. Wooden, Mary L. Titsworth, Wooden McLaughlin & Sterner, Indianapolis, Indiana, for Defendant.

## ORDER ON MOTION FOR SUMMARY JUDGMENT

McKINNEY, District Judge.

This matter pends on the motion of defendant Osteonics Corporation ("Osteonics") for summary judgment on the issue of preemption. Specifically, Osteonics argues that the state law claims brought by plaintiffs, William Chambers ("William") and Beverly Chambers (the "Chambers"), are preempted by the Medical Device Amendments of 1976 ("MDA") to the Federal Food, Drug and Cosmetic Act. *See* 21 U.S.C. §§ 360c *et seq.;* 21 U.S.C. §§ 301 *et seq.* In 1985, William underwent total hip replacement surgery to relieve the pain of osteoarthritis in his right hip. He received an implant of an Omnifit Micro–Structured Hip Stem 1007 (the "hip stem"). This hip stem was manufactured and sold by Osteonics under the Investigational Device Exemption regulations ("IDE") issued by the Food and Drug Administration ("FDA"), 21 C.F.R. §§ 812.1 to 812.150.

Essentially, the Chambers raise two main issues with respect to their claims. First, they contend that the hip replacement operation proceeded with a lack of informed consent. They base this claim on their allegation that the consent document signed by William did not contain an explanation about whether any compensation or any medical treatment were available if injury occurred, as required by federal regulation. *See* 21 C.F.R. § 50.25. Second, they argue that the hip stem was defective and unreasonably dangerous because of weakness in the metal caused by negligent manufacturing.

Investigational device exemptions are exemptions for medical devices from the usual requirements of establishing safety and effectiveness of the device before they can be sold. 21 C.F.R. § 812.1. The purpose of these exemptions is to "encourage, to the extent consistent with the protection of public health and safety and with ethical standards, the discovery and development of useful devices intended for human use, and to that end to maintain optimum freedom for scientific investigators" to pursue this purpose. *Id.* As part of the process, a detailed

application is submitted to the FDA that establishes a plan for studying the product's use with humans. The application must receive approval from both the FDA and from an institutional review committee at each institution at which the device will be tested. 21 C.F.R. § 812.62. Because the purpose of the experiment is to discern whether a device may be considered safe and effective, the regulation of IDE's relates more to the procedures followed, rather than substantive issues. *Slater v. Optical Radiation Corp.*, 961 F.2d 1330, 1333 (7th Cir.) *cert. denied*, 506 U.S. 917, 113 S.Ct. 327, 121 L.Ed.2d 246 (1992). However, the FDA will not grant an IDE unless it believes the device will probably be proven safe and effective. *Id.*

Turning to the Chambers' complaint regarding the consent, the Court notes that part of the FDA approval process for IDE's requires a consent form that complies with the regulations. *See* 21 C.F.R. § 812.25(g). Although regulations prohibit the inclusion of exculpatory language by which a subject waives or appears to waive any legal rights, the consent form is required to at least alert the subject to the possibility of the loss of certain legal rights. *See* 21 C.F.R. § 50.20; 21 C.F.R. § 50.25(6) and (7) (consent shall include information about compensation or medical treatment available if injury occurs, where to get additional information, and who to contact for answers to "pertinent questions about the research and research subjects' rights").

▮ Here, the consent form that Chambers signed simply explained the operation. Plfs.Brf. in Opp. to Mot. for Sum.J. of Def., Osteonics Corporation, Ex. 1. It explained the experimental nature of the hip stem's absence of cement and the experimental nature and purpose of the use of a coating of fine metal beads in lieu of cement. The only additional risk discussed is the added risk of a possible unusual reaction to the metal because it would be in direct contact with the bone. The consent did not inform William about the availability or unavailability of compensation or medical treatment if injury occurred. But it did state that the metal used in the experiment was the same as had been used in hip replacement surgery for many years. The consent also failed to provide other required information as noted by the FDA in its March 27, 1984, letter to Osteonics regarding the modified consent form. *See* Supp.Subm. of Evid. of Osteonics Corporation in Supp. of Mot. for Sum.J., Koch Aff., Ex. B. Consequently, it did not conform to regulations relating to informed consents for IDEs.

The impact of an inadequate informed consent was anticipated in a case upon which defendant wishes to rely. In *Slater*, 961 F.2d 1330, the court observed that even within the scope of preemption, if the risks of the experimental procedure are not adequately explained to the patient, he or she retains the right to sue for the tort of medical battery. *Id.* at 1334. However, in that case Slater, who received a lens implant in his eye, did not claim he was inadequately informed of the risks involved with the operation. Rather, he claimed the lens was poorly designed and was therefore unsafe. The court concluded from a statement in the consent form Slater signed that he understood he would have no remedy from the hospital in the event of injury to himself from the implantation. *Id.* Had it been otherwise, the court noted, a claim for lack of informed consent would not be preempted by the MDA. *Id.* Consequently, the *Slater* court did not need to confront the issue of who would be liable in the event the consent was challenged.

This case brings forth the exact situation anticipated by the court in *Slater*. The Chambers claim that the surgery occurred without a proper informed consent. Although such claims are not preempted by the MDA, the problem with the Chambers's informed consent claim is its failure to show that Osteonics is liable for the absence of information. In most cases, a claim for lack of informed consent addresses the duty of the physician, not the manufacturer. *Gile v. Optical Radiation Corp.*, 22 F.3d 540, 543 (3d Cir.), *cert denied*, — U.S. —, 115 S.Ct. 429, 130 L.Ed.2d 342 (1994). If, however, the manufacturer fails to provide the necessary forms or information to the doctor to obtain informed consent, the claim for failure of consent may be brought against the manufacturer. *See Id.*

According to William's doctor, Osteonics provided him with a copy of the FDA-approved consent form, but that form was modified by some unspecified committee at Indiana University Medical Center. *See* Dep. of William N. Capello, M.D. at 99. The modified form was submitted by Osteonics to the FDA for approval, but the FDA noted eight specific deficiencies in that form. Koch Aff. ¶ 3, Ex. B. Provided those deficiencies were remedied, the FDA wrote, the hospital would be permitted to proceed with the study. *Id.* On March 23, 1984, Osteonics sent a letter to Dr. Capello informing him of the deficiencies, and that he had three alternatives. First, he could immediately re-modify his consent form to correct its deficiencies, second, he could use the FDA-approved Osteonics form, or third, he could discontinue participation in the study. Koch Aff. ¶ 4, Ex. C. According to a letter dated March 28, 1984, the hospital chose to use the Osteonics consent form instead of modifying its own. Koch Aff. ¶ 5, Ex. D. However, that FDA-approved consent form was not signed by William, and no explanation has been offered about why William signed a different consent form. Under the circumstances presented by the undisputed facts, Osteonics cannot be held liable for any alleged lack of informed consent.

■ With respect to the second claim, negligent manufacture, the Chambers have offered affidavits of two proposed experts, in which each states that the metal used in the hip stem that was implanted in William's femur was defective. Plfs' Subm. of Evid. in Opp. to Mot. for Sum.J. of Def., Osteonics Corporation, § 1, Forte Aff., § 2, Walson Aff. Specifically, Mark R. Forte ("Forte") states that his opinion is based on his personal knowledge from having worked at Osteonics, and on his review of the complaint, the evidence submitted in support of summary judgment, the answers to interrogatories, and the documents produced by Osteonics in connection with this litigation. Forte also examined the actual hip stem that was used on William, the results of tests performed on that hip stem, and William's x-rays. From his review of all of these materials, Forte concludes the following:

a. The Omnifit Micro–Structured Hip Stem 1007 which was implanted in Mr. Chambers on June 28, 1985 contained surface and sub-surface metallurgical defects which occurred during the manufacturing of the hip stem by Osteonics Corporation, specifically during the casting process....

b. These ... defects caused stress concentration, elevated stresses and cracks which produced premature fatigue fracture in the neck portion....

c. The area of critical design and expected maximal loading stress of the Omnifit Micro–Structured Hip Stem 1007 is in the mid-stem area and not in the neck portion ... where the fracture occurred.

d. The metallurgical defects ... were the result of negligent manufacturing processes of Osteonics Corporation.

e. The metallurgical defects ... rendered the hip stem defective and in an unreasonably dangerous condition at the time it left the control of Osteonics Corporation.

f. During the time the prosthesis was implanted in Mr. Chambers, there was relative motion between the femoral head component and the neck of the hip stem. This was a result of Osteonics Corporation's manufacturing process ... and this resulted in increased stress in the area of the fracture ...

g. Failure in the area of the fracture ... will not occur in the absence of structural or metallurgical defects in the hip stem which occur and are created during the manufacturing process.

Forte Aff. ¶¶ 12, 13, 14.

Robert P. Walson ("Walson") reviewed the same documents and materials that Forte examined. Walson's affidavit also states that the metal used in the hip stem was defective, and that the defects were caused by Osteonics' manufacturing process. Specifically, he states:

a. The hardness of the Omnifit Micro–Structured Hip Stem 1007 which was implanted in Mr. Chambers ... in its neck area, was below the recommended hardness for ASTM F–75 which was the metallurgical specification for that hip stem.

b. The failure of the hardness of the hip stem ... resulted from the manufacturing process used by Osteonics Corporation....

c. The failure of Osteonics Corporation's manufacturing process ... was the result of negligence on the part of Osteonics Corporation in manufacturing the hip stem.

d. The failure of Osteonics Corporation's manufacturing process to produce the hip stem with a minimum hardness ... rendered the hip stem defective and unreasonably dangerous for its intended use....

e. The hip stem contained sub-surface and surface metallurgical defects which occurred during the manufacturing process ... specifically during the casting process.

f. These metallurgical defects caused stress concentration, elevated stresses and cracks which produced premature fatigue fracture in the neck portion of the hip stem.

g. The metallurgical defects ... were the result of negligent manufacturing processes of Osteonics Corporation.

h. The metallurgical defects ... made the hip stem defective and in an unreasonably dangerous condition....

Walson Aff. ¶ 9. Both of these affidavits render the opinion that the defects in the metal of the hip stem occurred during the manufacturing process, and that the Osteonics manufacturing process was negligent.

■ Generally, when a device that is regulated as an IDE causes injury, state tort law claims against the manufacturer based on negligence, breach of warranty or product liability are preempted. *See Slater*, 961 F.2d at 1333. Under certain circumstances, however, a claim may still be lodged for negligent manufacturing. *See Estate of LeMay v. Eli Lilly & Co.*, 881 F.Supp. 428, 430 (E.D.Wis.1995); *Reiter v. Zimmer, Inc.*, 830 F.Supp. 199, 200, 204 (S.D.N.Y.1993). Such

a claim is customarily framed as a charge that the manufacturer did not follow its own FDA approved manufacturing procedures. *Id.* It cannot be brought on the basis that the procedures approved by the FDA are negligent, because then a tort remedy would impose a requirement different from or in addition to any MDA requirement that is applicable to the product and related to safety and effectiveness. 21 U.S.C. § 360k(a).[1] Such a claim would be preempted.

■ Recently, the Seventh Circuit has clarified that the term "any requirement" in 21 U.S.C. § 360k(a) "is broad enough to include at least some common law causes of action within the statute's preemptive scope." *Mitchell v. Collagen Corporation*, 67 F.3d 1268, 1276 (7th Cir.1995). When determining which causes of action are preempted, the court noted that the Supreme Court has emphasized that when Congress uses the term "relate to" in a preemption provision, the term should be construed broadly. *See American Airlines, Inc. v. Wolens*, —— U.S. ——, 115 S.Ct. 817, 130 L.Ed.2d 715 (1995). Moreover, § 360k(a) expressly preempts not only matters relating to the safety and effectiveness of a device, but also "any other matter included in a requirement." *Mitchell*, 67 F.3d at 1278 (quoting 21 U.S.C. § 360k(a)).

In the investigational device context, MDA preemption is somewhat broader because "a cramped ... interpretation would cripple the exemption for individual devices." *Slater*, 961 F.2d at 1333. "The FDA can hardly be expected to specify the safe and effective design of a device when it is still experimental." *Id.* Instead the FDA looks to the safety and effectiveness of the procedures used to produce and test the device. As part of the process to apply for an IDE, Osteonics submitted comprehensive device manufacturing details. *See* Ex. A of Osteonics Subm. of Evid., IDE Application. Those details out-

---

1. Section 360k(a) provides in pertinent part:
[N]o State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement—
(1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and

(2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter.
21 U.S.C. § 360k(a).

line the manufacturing process for the hip stem at issue. After several exchanges between Osteonics and the FDA regarding various aspects of the manufacturing process, the application for an IDE was finally approved on January 18, 1985. *Id.* Ex. F, Letter from FDA.

None of the evidence offered by the Chambers supports an inference that Osteonics failed to follow its FDA approved manufacturing procedures in the production of the hip stem at issue. The vague references by both experts to "negligent manufacturing" do not assist the Court. Not only do they represent bare legal conclusions about the manufacturing process, but they fail to specify exactly what constituted the alleged negligence. Consequently, nothing more than speculation supports any inference that Osteonics failed to follow its own FDA approved manufacturing procedures.

The one allegation made by the Chambers that Osteonics may have strayed from its FDA approved procedures was that the quality-control x-rays taken of the hip stems in the same batch as Chambers' device were destroyed within six months of their manufacture. Plfs' Brf. at 17–18. The Chambers ask the Court to draw a negative inference from the absence of this evidence, concluding that the x-rays must have revealed the defects, but the stems were distributed anyway. Such an inference would be improper given that Osteonics has provided the Court with specific, uncontradicted evidence to negate it. According to an affidavit taken from the person who was the Quality Control Supervisor at Osteonics during the relevant times, the processes and procedures followed at Osteonics during the manufacture of Chambers' hip stem were the same ones approved by the FDA. Ruggiero Aff. ¶ 9. Those procedures included the taking of x-rays by an outside vendor, which x-rays were evaluated by Osteonics' employees, who then signed a Manufacturing Process Ticket, a copy of which is attached to the affidavit as Exhibit A. No defects were noted in the batch from which William's hip stem was taken. *Id.*

Moreover, as shown in Osteonics' evidence, the IDE application process required Osteonics to submit detailed descriptions of its man-

ufacturing procedures. The FDA specifically questioned certain aspects of those procedures, such as, the effect of the heat sintering process on the fatigue strength of the fabricated device, and the fatigue strength of the porous coating/solid substrate interface. *See* Subm. of Evid. of Osteonics Corporation in Supp. of Mot. for Sum.J., Ex. B, Sept. 9, 1983 FDA Letter. Apparently, the FDA was concerned about any weakening of the metal caused by the process for applying the porous coating. That coating is what enables the hip stem to be used without cement. The feasibility of using the hip stem without cement was the subject of the investigation. Approval for Osteonics to proceed with its clinical studies of the hip stem device was dependant on a satisfactory response to these concerns.

In light of the fact that approval was subsequently given, Osteonics' response must have been satisfactory. Although that response did not have to satisfy the agency that the device itself would be safe and effective, it did have to demonstrate procedures that enabled the FDA to determine that the device showed "sufficient promise of being proved safe and effective to justify the risk of its being used on human beings." *Slater,* 961 F.2d at 1333.

The FDA's approval of an IDE constitutes its belief in that promise, but that belief is different from a certification that the device is safe and effective. The Chambers's complaint that the manufacturing process produced a device that was not safe and effective sets up a direct collision with federal policy. *See Id.* If this Court were to find that the procedures used by Osteonics were insufficient to produce a safe and effective product it would be imposing a requirement that is different from and in addition to that imposed by the FDA. The FDA required reassurance that the device showed "sufficient promise" of being proved safe and effective. If the Court were to find Osteonics liable for producing a product that was not safe and effective, it would impose a requirement that adds to the FDA requirement.

To the extent that the Chambers are trying to base a claim of negligence on the actual manufacturing processes approved by

the FDA and used by Osteonics, that claim is preempted. To the extent they are claiming that Osteonics failed to follow the approved procedures, the claim fails due to insufficient proof. Consequently, In the absence of specific proof that Osteonics strayed from its FDA approved procedures for manufacturing hip stems, and that the variation was not an attempt to further the investigation, this Court finds that the Chambers claims against Osteonics are preempted. In light of the undisputed facts this Court holds that Osteonics is entitled to judgment as a matter of law. The defendant's motion for summary judgment is **GRANTED.**

IT IS SO ORDERED.