776 S.E.2d 374

The STATE, Respondent,

v.

Charles Allen CAIN, Appellant.

Appellate Case No. 2013–000817.
No. 5324.

Court of Appeals of South Carolina.

Heard Jan. 7, 2015.
Decided July 15, 2015.
Withdrawn, Substituted and Refiled Sept. 2, 2015.
Rehearing Denied Sept. 2, 2015.

510

Thomas James Rode, of Thurmond Kirchner Timbes & Yelverton, P.A., of Charleston, and Chief Appellate Defender, Robert Michael Dudek, of Columbia, for appellant.

Attorney General, Alan McCrory Wilson and Assistant Deputy Attorney General, David A. Spencer, both of Columbia, for respondent.

WILLIAMS, J.

Charles Allen Cain appeals his conviction for trafficking methamphetamine, arguing the circuit court erred in (1) admitting testimony from the State's forensic chemistry expert regarding the "theoretical yield" of methamphetamine he could have produced and (2) denying his motion for a directed verdict. We affirm.

**FACTS/PROCEDURAL HISTORY**

On January 17, 2012, Deputy Kevan Kyle and Deputy Chris Wilbanks, both of the Spartanburg County Sheriff's Office (the Sheriff's Office), encountered Cain and Tiphani Parkhurst while attempting to serve a family court bench warrant for Travis Kirby at a Spartanburg County home. Although the house had no running water or electricity, it appeared Cain and Parkhurst were illegally obtaining both through a drop cord and a hose pipe running from a neighboring trailer. Further, the house appeared to be under construction.

The deputies knocked on the backdoor of the house—which led to a single bedroom—because they saw a vehicle parked directly in front of that door. When Cain and Parkhurst came to the door, the deputies explained they were looking for Kirby and requested identification. Cain and Parkhurst produced their driver's licenses but denied knowing Kirby. They also told Deputy Kyle they were "renting the bedroom from the owner of the house ... and they had nothing else to do with the rest of the house." While it appeared Cain and Parkhurst had been living in the bedroom, which had no bathroom or kitchen, the deputies believed they had access to the rest of the house as well. Deputy Kyle further believed Cain and Parkhurst were hiding Kirby because they seemed nervous, were "making furtive gestures," and did not want him to look inside the rest of the house.

Deputy Kyle showed Cain and Parkhurst the bench warrant and explained the deputies had a right to search the house if

they believed Kirby was inside. With the consent of Cain and Parkhurst, the deputies searched the bedroom as well as the rest of the house. During the search, Deputy Kyle observed a bottle resting on the counter that had "tubing coming from the top." The tubing ran through a window and opened up outside. He also discovered several discarded bottles with multicolored pellets, coffee filters, tin foil, and batteries in the living room—all of which are "common [for] a one pot meth lab." Based on the deputies' training and experience, they determined the house was being used as a lab to manufacture methamphetamine.

When the deputies returned to Cain and Parkhurst's bedroom, they found the interior door to the bedroom that led to the rest of the house was barricaded. Additionally, the deputies discovered Cain and Parkhurst had left the residence in Parkhurst's vehicle. The deputies further noticed what appeared to be the contents of a one pot meth lab—multicolored pellets poured out onto the grass and concrete. The pellets were still fresh and wet.

Thereafter, Cain and Parkhurst were indicted for trafficking methamphetamine in violation of section 44–53–375(C) of the South Carolina Code (Supp.2014). The case was called for a jury trial in Spartanburg County. Because Cain and Parkhurst failed to appear at trial, they were jointly tried in their absence on February 28 and March 1, 2013.

During pretrial motions, Cain moved to dismiss his indictment, arguing the State could not establish the "attempt to manufacture" element for trafficking methamphetamine because no methamphetamine was found in the home. The State, however, sought to establish Cain's guilt "through extrapolation from the aggregate components" found in the house to demonstrate the yield of methamphetamine would have been more than the trafficking quantity, arguing the plain meaning of the statute allowed it to proceed under a theoretical yield theory. Based on this theoretical yield calculation, the State argued Cain and Parkhurst had the necessary ingredients to produce between ten and twenty-eight grams of methamphetamine.[1]

1. Acknowledging the novelty of this issue, the State directed the circuit court to two cases from other jurisdictions in support of its argument:

Subsequently, the State called Beth Stuart to testify. Stuart, a forensic chemist with the Sheriff's Office, examined the crime scene on January 17, 2012.[2] Per the State's request, the circuit court qualified Stuart as an expert in "forensic chemistry and chemical analysis" without objection.

Stuart explained that people often use common household products to manufacture methamphetamine. She then described the "one pot method" in great detail and stated Cain and Parkhurst employed this method to manufacture methamphetamine at the Spartanburg County home. According to Stuart, the Sheriff's Office photographed the components in and around the house—and a company specializing in the disposal of chemical waste came to the house to dispose of the meth lab components—because the components were too dangerous to bring back to the Sheriff's Office. She also said the Sheriff's Office does not fingerprint meth labs due to the inherent danger of the chemicals used to manufacture methamphetamine.

Moreover, Stuart testified that "the only thing of significance" she found inside the bedroom was a piece of aluminum foil shaped to smoke methamphetamine. In the living room, however, Stuart found twenty empty pseudoephedrine packets (blister packs) in trash bags, each of which previously contained twenty-four 30–milligram tablets. She found four additional blister packs in a trashcan outside Cain and Parkhurst's bedroom that each previously contained ten 120–milligram tablets of pseudoephedrine. Stuart concluded the blister packs previously contained a total of 19.2 grams of pseudoephedrine. In addition to the empty blister packs, Stuart found the following items in and around the house: a bottle

---

*State v. Knapp*, 778 N.W.2d 218, 2009 WL 4842395, at *1 (Iowa Ct.App.2009), and *United States v. Spencer*, 439 F.3d 905 (8th Cir.2006). The circuit court repeatedly took the matter under advisement.

**2.** Stuart has a B.S. in chemistry and biochemistry from the College of Charleston, a M.S. in chemistry from the University of South Carolina, and over eight years of experience as a chemical analyst. Stuart testified she completed training at the police academy, as well as the Drug Enforcement Administration's "forensic chemist school" and "clandestine lab school." Stuart is also a member of the Clandestine Lab Investigating Chemist Association and is certified by the American Board of Criminalistics in all areas of forensic science.

with tubing in the bathroom, instant cold packs, a plastic funnel, a roll of aluminum foil, face masks, coffee filters, wrappings from lithium batteries, needles, several "one pot" bottles, and the "pink solid" dumped out of a "one pot."

To calculate the theoretical yield, Stuart explained she "can see how much starting stuff they had and work [her] way to how much product they could [have] made with that starting stuff." She further stated she uses "the weights of all the different compounds in [an equation] to determine theoretical yield." The State then asked Stuart how much methamphetamine an individual could make with 19.2 grams of pseudoephedrine. Cain objected to the admission of this testimony, questioning its reliability and doubting whether "some learned treatise" supported the theory. Cain argued Stuart's theoretical yield testimony was outside the scope of her qualification as an expert in forensic chemistry. The circuit court overruled the objection subject to the State laying a proper foundation.

The State then established that—as part of earning her bachelor's degree as well as her master's in chemistry—Stuart worked in "actual research settings" with equations and theoretical yields "to determine how much product [she] wanted and how much [she] needed to start with" to perform reactions. On voir dire, Stuart explained the theoretical yield equation was "pseudoephedrine, plus lithium, plus ammonia gas yields methamphetamine." She also stated she knew it is "a one-to-one molar ratio between pseudoephedrine and methamphetamine from the equations of how to make meth[amphetamine]." The circuit court then qualified Stuart as "an expert in the field of chemistry to be able to give her opinion in the area of theoretical yields."

After the additional qualification, Stuart testified that an individual could manufacture the following amounts of methamphetamine with 19.2 grams of pseudoephedrine: 17.67 grams with a 100% yield, 14.13 grams with an 80% yield, 13.25 grams with a 75% yield, and 11.48 grams with a 65% yield. Stuart, however, acknowledged she had no way of determining the percentage yield Cain and Parkhurst theoretically would have been able to obtain. She also acknowledged that her figures were based on chemical conversions performed by a

trained chemist using pure chemicals, a hood, and real glass-ware in "ideal laboratory conditions." Stuart agreed that, if some chemicals do not properly react and become wasted, it is not possible to attain a 100% yield. Moreover, she conceded that neither methamphetamine nor pseudoephedrine was found in or around the house.

Cain moved for a directed verdict after the State rested its case, arguing the evidence of custody and control of the requisite ingredients was insufficient to establish intent to traffic methamphetamine. The circuit court denied Cain's motion for a directed verdict on the custody and control argument but took under advisement the theoretical yield issue, electing to take it up at the close of all evidence.

Subsequently, the defense presented testimony from Leon Fowler Sr., who lived in the trailer located one hundred feet behind the house the deputies searched. Fowler explained that his son owned both the house and the trailer. Fowler further stated he thought Cain and Parkhurst were "living in that one [bed]room," but he was not sure. He was also unsure about how long Cain and Parkhurst lived in the house, but said it was "not over two or three weeks." Fowler testified that he did not know Cain and Parkhurst; he just knew they were his son's friends. Nevertheless, he would let them come to his trailer to bathe and use the restroom because the house had no running water.

Although Fowler was not sure whether Cain and Parkhurst had a power cord running from his trailer to the house, Fowler said his son sometimes did "when he was working on the house." Fowler further stated it seemed like a power cord was hooked up when the police arrived, but he would not swear to it. Finally, Fowler confirmed he was unaware of the meth lab in the house, stating he did not want to know what was going on in the house.

At the close of all evidence, the circuit court denied Cain's motion to dismiss based on a "plain reading of the statute" and the "persuasive authority" provided by the State. The circuit court believed "theoretical yield would be an appropriate analysis in this case" and submitted a special interrogatory to the jury, instructing it to determine whether the State proved

beyond a reasonable doubt that the theoretical yield was ten or more, but less than twenty-eight, grams.

The jury found Cain guilty of trafficking methamphetamine, and the circuit court denied his motion for a new trial. On April 11, 2013, Cain was sentenced to ten years in prison. This appeal followed.

## ISSUES ON APPEAL

I. Did the circuit court err in admitting Stuart's scientific expert testimony regarding the theoretical yield of methamphetamine Cain could have produced from the empty blister packs of pseudoephedrine?

II. Did the circuit court err in denying Cain's motion for a directed verdict?

## LAW/ANALYSIS

### I. Theoretical Yield Testimony

#### A. Reliability

Cain first argues the circuit court erred in admitting Stuart's expert testimony regarding the theoretical yield of methamphetamine he could have produced because the State failed to prove Stuart's methodology was reliable and would assist the trier of fact. We disagree.

"Generally, the admission of expert testimony is a matter within the sound discretion of the [circuit] court." *State v. Cope*, 405 S.C. 317, 343, 748 S.E.2d 194, 208 (2013) (quoting *State v. Whaley*, 305 S.C. 138, 143, 406 S.E.2d 369, 372 (1991)). "Thus, we will not reverse the [circuit] court's decision to admit or exclude expert testimony absent a prejudicial abuse of discretion." *Id.* at 343–44, 748 S.E.2d at 208 (citing *State v. White*, 382 S.C. 265, 269, 676 S.E.2d 684, 686 (2009)). "An abuse of discretion occurs when the [circuit] court's ruling is based on an error of law or a factual conclusion that is without evidentiary support." *State v. Price*, 368 S.C. 494, 498, 629 S.E.2d 363, 365 (2006) (citations omitted).

"All expert testimony must satisfy the Rule 702 criteria, and that includes the [circuit] court's gatekeeping function in ensuring the proposed expert testimony meets a reliability threshold for the jury's ultimate consideration."

*White,* 382 S.C. at 270, 676 S.E.2d at 686. Rule 702, SCRE, provides the following:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

The admissibility of scientific evidence depends upon "the degree to which the trier of fact must accept, on faith, scientific hypotheses not capable of proof or disproof in court and not even generally accepted outside the courtroom." *State v. Jones,* 273 S.C. 723, 731, 259 S.E.2d 120, 124 (1979) (citation omitted). When the circuit court admits scientific evidence under Rule 702, it "must find the evidence will assist the trier of fact, the expert witness is qualified, and the underlying science is reliable." *State v. Council,* 335 S.C. 1, 20, 515 S.E.2d 508, 518 (1999).

■ "Reliability is a central feature of Rule 702 admissibility...." *White,* 382 S.C. at 270, 676 S.E.2d at 686 (citations omitted). A court should look at several factors to determine the reliability of scientific expert testimony: "(1) the publications and peer review of the technique; (2) prior application of the method to the type of evidence involved in the case; (3) the quality control procedures used to ensure reliability; and (4) the consistency of the method with recognized scientific laws and procedures." *Council,* 335 S.C. at 19, 515 S.E.2d at 517 (citation omitted).

■ Additionally, if the evidence is admissible under Rule 702, then the circuit court should determine whether "its probative value is outweighed by its prejudicial effect." [3] *Id.* at 20, 515 S.E.2d at 518 (citing Rule 403, SCRE). "Once the evidence is admitted under these standards, the jury may give it such weight as it deems appropriate." *Id.* at 20–21, 515 S.E.2d at 518.

In the instant case, after the State laid a foundation and Cain cross-examined Stuart during voir dire, the circuit court

---

3. Because neither party addresses whether the circuit court properly weighed the probative value of Stuart's theoretical yield testimony against its prejudicial effect, we decline to address that portion of the analysis in determining this issue.

properly qualified her as an expert in chemistry to be able to give her opinion on theoretical yields. *See id.* at 20, 515 S.E.2d at 518 (stating the circuit court must find the expert witness is qualified). Cain, however, does not contest the circuit court's finding that the expert was qualified. Thus, our analysis focuses on his argument that Stuart's theoretical yield methodology was not reliable and could not assist the trier of fact. *See id.* (stating the circuit court must also find the expert's testimony will assist the trier of fact and the underlying science reliable).

Based upon our review of the record, we find the circuit court properly concluded Stuart's scientific expert testimony regarding the theoretical yield methodology was reliable. First, the circuit court thoroughly considered the prior application of theoretical yield analysis to the type of evidence involved in this case. *See id.* at 19, 515 S.E.2d at 517 (stating the circuit court should consider the "prior application of the method to the type of evidence involved in the case" (citation omitted)). At the beginning of trial, the State cited cases from other jurisdictions in which courts approved of experts giving theoretical yield testimony in similar situations,[4] and the circuit court repeatedly took the matter under advisement. At the close of all evidence, the circuit court denied Cain's motion to dismiss, finding these cases persuasive and the theoretical yield analysis appropriate for this case. The cases on which the court based its ruling were directly on point and, therefore, qualified as prior applications of the theoretical yield method to the type of evidence involved in the instant matter.

Furthermore, the circuit court had sufficient evidence from which it could conclude the theoretical yield methodology was consistent with recognized scientific laws and procedures. *See Council,* 335 S.C. at 19, 515 S.E.2d at 517 (stating the court

---

4. *See Spencer,* 439 F.3d at 916 (holding the evidence was sufficient for the jury to find the appellant attempted to manufacture methamphetamine when, although he may not have possessed all the materials for a fully working methamphetamine lab, he "had ordered, received, and possessed chemicals and equipment necessary to manufacture methamphetamine"); *Knapp,* 2009 WL 4842395, at *4 (holding the amount of methamphetamine appellant could have yielded based upon the crushed pseudoephedrine found on the appellant's person, coupled with the other evidence presented, was sufficient for a factfinder to infer a conspiracy to manufacture more than five grams of methamphetamine).

should also consider "the consistency of the method with recognized scientific laws and procedures" (citation omitted)). At trial, Stuart testified that calculating the theoretical yield involved basic chemistry equations. Stuart stated she began using chemical equations during her first semester of college, explaining that every chemistry course involved equations. She further testified that determining a yield based on multiple ingredients is a "core standard" of chemistry. Accordingly, Stuart's testimony demonstrates the science behind the methodology was reliable because it was consistent with recognized scientific laws and procedures.

Additionally, Stuart adequately explained the quality control procedures she uses to ensure reliability of the theoretical yield method. *See id.* (stating the court should look at "the quality control procedures used to ensure reliability" (citation omitted)). Throughout her schooling and in actual research settings, Stuart used equations and theoretical yields to perform reactions and make chemicals. Stuart stated she had produced methamphetamine "[i]n the DNA methamphetamine school," where she "ha[d] to go through the reactions and methamphetamine and determine yields." Moreover, Stuart was able to calculate the quantity of methamphetamine that could have been produced based on different yield percentages, taking into account various rates of error.

Based on the foregoing, we hold the circuit court clearly performed its gatekeeping function in the instant case by thoroughly considering the reliability of Stuart's methodology. *See White*, 382 S.C. at 270, 676 S.E.2d at 686 (stating the circuit court must perform its "gatekeeping function [by] ensuring the proposed expert testimony meets a reliability threshold for the jury's ultimate consideration"); *Council*, 335 S.C. at 20, 515 S.E.2d at 518 (outlining the factors a court should consider in determining whether the underlying science used in expert testimony meets the reliability standard under Rule 702, SCRE).

Nevertheless, Cain argues the theoretical yield analysis did not assist the trier of fact because it was not reliable. In light of our previous holding that Stuart's methodology was reliable, we disagree and find the circuit court properly concluded Stuart's expert testimony regarding the theoretical yield anal-

ysis would assist the trier of fact in determining a fact at issue in this case. *See Council,* 335 S.C. at 20, 515 S.E.2d at 518 (stating the circuit court must find the scientific evidence will assist the trier of fact). While Stuart and the deputies found all of the components of a methamphetamine lab in Cain's home, the blister packs of pseudoephedrine they discovered were empty. Thus, Stuart's theoretical yield equations helped the jury determine how much methamphetamine Cain could have produced—an important fact at issue—based on the amount previously contained in the empty blister packs as well as the other components found at the scene.

Accordingly, we affirm the circuit court's admission of Stuart's expert testimony regarding the theoretical yield of methamphetamine Cain could have produced because the court properly found her methodology was reliable and would assist the trier of fact in determining a fact at issue.

### B. Stuart's Conclusion

▆ Cain further contends the circuit court erred in admitting Stuart's expert testimony because the State failed to establish her conclusion was supported by facts. According to Cain, Stuart improperly relied solely on hypothetical facts— the empty blister packs of pseudoephedrine—to calculate the theoretical yield, and she presented no testimony regarding the amounts of other ingredients present at the scene. We disagree.

▆ Rule 703, SCRE, outlines the basis upon which experts may offer opinion testimony and provides the following:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

While an expert may offer an opinion based upon hypothetical facts, those facts must have evidentiary support. *See Campbell v. Paschal,* 290 S.C. 1, 17, 347 S.E.2d 892, 902 (Ct.App. 1986) ("The facts used in a hypothetical question presented to an expert witness must have some evidentiary support." (citations omitted)); *see also Newman v. Hy–Way Heat Sys., Inc.,*

789 F.2d 269, 270 (4th Cir.1986) ("It is fixed law that an expert can give [an] opinion on the basis of hypothetical facts, but those facts must be established by independent evidence properly introduced." (citation omitted)).

Other jurisdictions considering the theoretical yield issue have determined evidence of yield calculations based upon empty precursor containers is admissible and sufficient to support a factual finding for the intended quantity of methamphetamine production. *See, e.g., United States v. Engler,* 521 F.3d 965, 974 (8th Cir.2008) (finding the evidence of "empty blister packs representing 2,016 pseudoephedrine pills which could theoretically yield 55 grams of methamphetamine" was sufficient to support a verdict for attempted manufacture of more than five grams); *United States v. Titlbach,* 339 F.3d 692, 696 (8th Cir.2003) ("A chemist's testimony at trial substantiates a finding that the [meth] lab was capable of producing a maximum theoretical yield of 510 grams of actual methamphetamine, based on empty precursor containers."); *United States v. Basinger,* 60 F.3d 1400, 1409–10 (9th Cir. 1995) (finding that, for sentencing purposes, reliance on an expert's yield calculations of methamphetamine based upon two empty one-pound containers of ephedrine was not clearly erroneous); *United States v. Beshore,* 961 F.2d 1380, 1383 (8th Cir.1992) (finding that, "[e]ven in the absence of a necessary precursor chemical[,] the district court could properly approximate the amount of controlled substance that could have been produced" because an "approximation does not require that every precursor chemical be present").

Additionally, in *Varble v. Commonwealth,* the Kentucky Supreme Court rejected the appellant's argument that he could not be convicted of manufacturing methamphetamine because no anhydrous ammonia or coffee filters were recovered. 125 S.W.3d 246, 254 (Ky.2004), *superseded on other grounds by statute,* KRE 103, *as recognized in Stansbury v. Commonwealth,* 454 S.W.3d 293, 298 n. 1 (Ky.2015). According to the court, testimony that the odor of anhydrous ammonia was emanating from two air tanks and the discoloration of brass fittings was likely caused by anhydrous ammonia was circumstantial evidence of the appellant's possession of the precursor. *Id.* The court further stated appellant's argument was "akin to claiming that his possession of twenty-two Su-

dafed blister packs would not support his conviction because the blister packs were empty." *Id.* Nevertheless, the court concluded that, given the appellant "was found in possession of all the other chemicals necessary to manufacture methamphetamine," it was for the jury to decide whether he possessed those chemicals at the same time he possessed the anhydrous ammonia and the Sudafed. *Id.*

In the instant case, Stuart gave the following explanation of the equation she used to calculate the theoretical yield:

I can take the weight of the [p]seudoephedrine and do the math of its mass from the periodic table and tell you how many moles of [p]seudoephedrine I have. I know it's a one-to-one molar ratio between [p]seudoephedrine and methamphetamine from the equations of how to make meth[amphetamine].... [A]ll I need to do is take that amount and do it times the mass of methamphetamine in order to get how much methamphetamine is made.

Based upon the amount of pseudoephedrine each empty blister pack contained, as well as her experience using this equation, Stuart calculated the theoretical yield of methamphetamine Cain could have produced under various yield percentages. Stuart further testified she found bottles of "pink mush"—the waste product of methamphetamine—along with two one-pots in the last stages of production, as evidenced by a "grimy" two-liter bottle with a tube running out of the bathroom window. According to Stuart, the pink mush was comprised of remnants of cold medicine tablets stripped of the active ingredient necessary to produce methamphetamine.

Based on the foregoing, we find the hypothetical facts upon which Stuart based her calculations and offered an opinion regarding the theoretical yield were supported by other evidence properly admitted into the record. *See, e.g., Beshore,* 961 F.2d at 1383 (finding that, "[e]ven in the absence of a necessary precursor chemical[,] the district court could properly approximate the amount of controlled substance that could have been produced" because an "approximation does not require that every precursor chemical be present"); *Newman,* 789 F.2d at 270 (noting "an expert can give his opinion on the basis of hypothetical facts, but those facts must be

established by independent evidence properly introduced" (citation omitted)); *Campbell,* 290 S.C. at 17, 347 S.E.2d at 902 (stating hypothetical facts relied upon by experts "must have some evidentiary support" (citation omitted)). Further, to the extent Cain argues the record contains conflicting evidence and testimony, we believe the jury was free to give Stuart's testimony such weight as it deemed appropriate when weighing all of the evidence. *See Council,* 335 S.C. at 20–21, 515 S.E.2d at 518 (noting once scientific evidence is found to be reliable and admitted under the *Jones* standard, Rule 702, SCRE, and Rule 403, SCRE, "the jury may give it such weight as it deems appropriate").

Accordingly, we affirm the circuit court's admission of Stuart's expert testimony regarding the theoretical yield based on the empty blister packs of pseudoephedrine because her testimony was supported by the facts.

## II. Directed Verdict

Next, Cain contends the circuit court erred in denying his motion for a directed verdict, arguing the State presented insufficient evidence of intent to manufacture in excess of ten grams of methamphetamine to support a trafficking conviction. We disagree.

"Attempt crimes are generally ones of specific intent[,] such that the act constituting the attempt must be done with the intent to commit that particular crime." *State v. Nesbitt,* 346 S.C. 226, 231, 550 S.E.2d 864, 866 (Ct.App.2001) (citation omitted).

In the context of an attempt crime, specific intent means that the defendant consciously intended the completion of acts comprising the choate offense. In other words, the completion of such acts is the defendant's purpose. Additionally, the State must prove that the defendant's specific intent was accompanied by some overt act, beyond mere preparation, in furtherance of the intent, and there must be an actual or present ability to complete the crime. The preparation consists [of] devising or arranging the means or measures necessary for the commission of the crime; the attempt or overt act is the direct movement toward the commission[ ] after the preparations are made.

*Id.* (internal citations and quotation marks omitted). The overt act is sufficient if it goes "far enough toward accomplishment of the crime to amount to the commencement of its consummation." *Id.* (quoting *State v. Quick,* 199 S.C. 256, 259, 19 S.E.2d 101, 102 (1942)).

> The question of the intent with which an act is done is one of fact and is ordinarily for jury determination[,] except in extreme cases when there is no evidence thereon. The intent with which an act is done denotes a state of mind, and can be proved only by expressions or conduct, considered in the light of the given circumstances. Intent is seldom susceptible to proof by direct evidence and must ordinarily be proven by circumstantial evidence, that is, by facts and circumstances from which intent may be inferred.

*State v. Meggett,* 398 S.C. 516, 527, 728 S.E.2d 492, 498 (Ct.App.2012) (quoting *State v. Tuckness,* 257 S.C. 295, 299, 185 S.E.2d 607, 608 (1971)).

The statute under which Cain was charged provides as follows:

> A person who knowingly sells, manufactures, delivers, purchases, or brings into this State, or who provides financial assistance or otherwise aids, abets, attempts, or conspires to sell, manufacture, deliver, purchase, or bring into this State, or who is knowingly in actual or constructive possession or *who knowingly attempts to become in actual or constructive possession of ten grams or more of methamphetamine* . . . is guilty of a felony which is known as trafficking in methamphetamine . . . .

S.C.Code Ann. § 44–53–375(C) (Supp.2014) (emphasis added). The State charged Cain with violating the trafficking statute by attempting or aiding and abetting in the manufacture of methamphetamine. *See id.* Upon conviction of a first offense, an individual must be punished for "a term of imprisonment not less than three years nor more than ten years, no part of which may be suspended nor probation granted," if the quantity involved is "ten grams or more, but less than twenty-eight grams." § 44–53–375(C)(1)(a).

" 'Manufacture' means the production, preparation, propagation, compounding, conversion, or processing of a controlled substance, either directly or indirectly by extraction from

substances of natural origin, or independently by means of chemical synthesis, or by a combination of extraction and chemical synthesis...." S.C.Code Ann. § 44–53–110(25) (Supp.2014). " 'Methamphetamine' includes any salt, isomer, or salt of an isomer, or any mixture of compound containing amphetamine or methamphetamine." § 44–53–110(28). "Possession of equipment or paraphernalia used in the manufacture of ... methamphetamine is prima facie evidence of intent to manufacture." § 44–53–375(D). Paraphernalia is statutorily defined as "any instrument, device, article, or contrivance used, designed for use, or intended for use in ingesting, smoking, administering, manufacturing, or preparing a controlled substance." § 44–53–110(33).

■■■■■ "When ruling on a motion for a directed verdict, the [circuit] court is concerned with the existence or nonexistence of evidence, not its weight." *State v. Zeigler*, 364 S.C. 94, 101, 610 S.E.2d 859, 863 (Ct.App.2005) (citations omitted). "A defendant is entitled to a directed verdict when the State fails to produce evidence of the offense charged." *State v. Brandt*, 393 S.C. 526, 542, 713 S.E.2d 591, 599 (2011) (citing *State v. Ladner*, 373 S.C. 103, 120, 644 S.E.2d 684, 693 (2007)). Further, the circuit court "should grant a directed verdict when the evidence merely raises a suspicion that the accused is guilty." *Id.* (citing *State v. Hernandez*, 382 S.C. 620, 625–26, 677 S.E.2d 603, 605–06 (2009)). "Suspicion implies a belief or opinion as to guilt based upon facts or circumstances which do not amount to proof." *Zeigler*, 364 S.C. at 102, 610 S.E.2d at 863 (citations omitted). The circuit court, however, "is not required to find that the evidence infers guilt to the exclusion of any other reasonable hypothesis." *Id.* at 102–03, 610 S.E.2d at 863 (citations omitted).

■■■■■ In reviewing the denial of a motion for a directed verdict, this court must view "the evidence and all reasonable inferences in the light most favorable to the State." *Brandt*, 393 S.C. at 542, 713 S.E.2d at 599 (citing *State v. Weston*, 367 S.C. 279, 292, 625 S.E.2d 641, 648 (2006)). If any direct evidence or any substantial circumstantial evidence reasonably tends to prove the guilt of the accused, we must find the case was properly submitted to the jury. *Id.* (citation omitted). This court may only reverse a denial of a motion for a directed

verdict when no evidence supports the circuit court's ruling. *Zeigler*, 364 S.C. at 103, 610 S.E.2d at 863 (citation omitted).

In the instant case, Cain argues the circuit court erred in denying his motion for a directed verdict for the following reasons: (1) under the trafficking statute, the State was required to present evidence of potential yield and could not simply rely on a "hypothetical theoretical yield"; and (2) the State failed to prove Cain had custody and control of the pseudoephedrine sufficient to form an intent to manufacture in excess of ten grams of methamphetamine. We address each issue in turn.

## A. Evidence of Intent

Cain contends the circuit court erred in denying his motion for a directed verdict because the record lacked substantial circumstantial evidence of his intent to manufacture ten or more grams of methamphetamine. We disagree.

 As a preliminary matter, Cain argues the State was required to present evidence of "potential yield" calculations based on his particular capabilities and the manufacturing site—and could not simply rely on a "hypothetical theoretical yield"—to prove his intent. We find this issue is not preserved for our review. A review of the record reveals that, aside from the constructive possession issue, the only other issue raised in Cain's directed verdict motion was whether the State's evidence of trafficking was too speculative to present that charge to the jury. The theoretical yield versus potential yield argument was not raised as a ground in Cain's directed verdict motion, nor at any other point during the trial.[5] Thus, we decline the invitation to create a legal distinction between these terms of art for the first time on appeal. *State v. Russell*, 345 S.C. 128, 132, 546 S.E.2d 202, 204 (Ct.App.2001) (stating issues not raised to the circuit court in support of a motion for directed verdict are not preserved for appellate

---

5. The record is devoid of any reference to a potential yield calculation. Although Cain raised several objections during trial to the State relying on a theoretical weight to establish his intent to traffic methamphetamine, his objections were based on the fact that the State could not show evidence of an *actual* weight of methamphetamine because the pseudoephedrine blister packs were empty.

review (citation omitted)); *State v. Bailey,* 298 S.C. 1, 5, 377 S.E.2d 581, 584 (1989) ("A party cannot argue one ground for a directed verdict in trial and then an alternative ground on appeal." (citation omitted)).

■ To the extent Cain argues the evidence of his intent to manufacture ten or more grams of methamphetamine was too speculative, we disagree and find the circuit court properly submitted the trafficking charge to the jury. When viewed in a light most favorable to the State, the evidence of Cain's possession of the meth lab components—coupled with Stuart's properly admitted theoretical yield testimony—was sufficient for the circuit court to allow the jury to decide whether Cain intended to manufacture in excess of ten grams of methamphetamine. *See* S.C.Code Ann. § 44–53–375(C) (providing that a person "who knowingly attempts to become in actual or constructive possession of ten grams or more of methamphetamine . . . is guilty of a felony which is known as trafficking in methamphetamine"); § 44–53–375(D) (stating "[p]ossession of equipment or paraphernalia used in the manufacture of . . . methamphetamine is prima facie evidence of intent to manufacture"); *Hudson,* 277 S.C. at 203, 284 S.E.2d at 775 (noting when contraband materials are found on premises under the control of the accused, this "gives rise to an inference of knowledge and possession [that] may be sufficient to carry the case to the jury"); *Brandt,* 393 S.C. at 542, 713 S.E.2d at 599 (stating if any substantial circumstantial evidence reasonably tends to prove the guilt of the accused, an appellate court must find the case was properly submitted to the jury (citation omitted)).

Accordingly, we affirm the circuit court's denial of Cain's motion for a directed verdict on this ground.

## B. Evidence of Constructive Possession

■ Cain contends the circuit court also erred in denying his motion for a directed verdict because the evidence of custody and control—when viewed in the light most favorable to the State—does not support the finding that Cain possessed pseudoephedrine at a single time as part of a plan to manufacture in excess of ten grams of methamphetamine. Instead, Cain argues "the only inference to be drawn is that there were

either several smaller manufacturings, or several failed attempts over a period," all of which would be independent of the others. We disagree.[6]

■■■■■ "Actual possession occurs when the drugs are found to be in the actual physical custody of the person charged with possession, while constructive possession occurs when the person charged with possession has dominion and control over either the drugs or the premises upon which the drugs are found." *State v. Burgess,* 408 S.C. 421, 440, 759 S.E.2d 407, 417 (2014) (quoting *State v. Ballenger,* 322 S.C. 196, 199, 470 S.E.2d 851, 854 (1996)). "Constructive possession can be established by circumstantial as well as direct evidence, and possession may be shared." *State v. Hudson,* 277 S.C. 200, 202, 284 S.E.2d 773, 775 (1981) (citations omitted). "Possession requires more than mere presence." *State v. Jackson,* 395 S.C. 250, 255, 717 S.E.2d 609, 611 (Ct.App. 2011) (citation omitted).

■■■■■ Acts, declarations, or conduct of the accused may create an inference that the accused knew of the existence of contraband. *Id.* at 255, 717 S.E.2d at 612 (citing *Hernandez,* 382 S.C. at 624, 677 S.E.2d at 605). "Possession of drugs may be inferred from the circumstances and may be imputed to anyone who has the power and intent to control the disposition and use of the drugs." *State v. Brown,* 319 S.C. 400, 404, 461 S.E.2d 828, 830 (Ct.App.1995) (citation omitted). In a case in which "contraband materials are found on premises under the control of the accused, this fact in and of itself gives rise to an inference of knowledge and possession [that] may be sufficient to carry the case to the jury." *Hudson,* 277 S.C. at 203, 284 S.E.2d at 775 (citation omitted).

---

6. Initially, we note while Cain did not renew his motion for a directed verdict until after the jury was charged, the circuit court accepted the renewal as timely and ruled upon the motion, stating "[o]bviously we visited the issue, and you may not have said ... I'll renew, but that's the way I took it for both of you." The State raised no objection during this colloquy—and the record demonstrates the parties had a mutual understanding—but now maintains on appeal that the issue of constructive possession is not preserved. We disagree and find this issue preserved for appellate review. *See State v. Dunbar,* 356 S.C. 138, 142, 587 S.E.2d 691, 693 (2003) ("[F]or an issue to be preserved for appellate review, it must have been raised to and ruled upon by the [circuit court].").

In the instant case, we find the State presented substantial circumstantial evidence of Cain's custody and control of the pseudoephedrine originally contained in the empty blister packs to establish constructive possession. The evidence shows the deputies discovered an active meth lab with a batch of methamphetamine in the gassing-out phase. Moreover, the record indicates Stuart and the deputies found the following components in and around the house: a bottle with tubing in the bathroom, instant cold packs, a plastic funnel, a roll of aluminum foil, face masks, coffee filters, wrappings from lithium batteries, needles, several "one pot" bottles, and the "pink solid" dumped out of a "one pot." Although some evidence suggested Cain rented only a single bedroom and had no connection to the rest of the house, the record indicated he and Parkhurst were living alone in the house. Cain also fled the home and barricaded the door to his bedroom before the deputies discovered the meth lab, actions which we find to be further circumstantial evidence of his guilt. *See State v. Crawford*, 362 S.C. 627, 635–36, 608 S.E.2d 886, 890–91 (Ct. App.2005) (noting flight may be considered as evidence of guilt (citations omitted)).

Based upon our review of the record, the evidence of possession created a quintessential jury question, such that the circuit court properly denied Cain's motion for a directed verdict. *See, e.g., Varble*, 125 S.W.3d at 254 (concluding when appellant was found in possession of all the other chemicals necessary to manufacture methamphetamine, it was for the jury to decide whether he possessed those chemicals at the same time he possessed anhydrous ammonia and Sudafed). While Cain argues the circuit court should have drawn a different inference from the evidence, the court was concerned with the existence of evidence, not its weight. *See Zeigler*, 364 S.C. at 101, 610 S.E.2d at 863 (noting that, when a circuit court rules upon a directed verdict motion, the court "is concerned with the existence or nonexistence of evidence, not its weight"(citations omitted)).

Accordingly, we affirm the circuit court's denial of Cain's motion for a directed verdict on the issue of constructive possession.

534

## CONCLUSION

Based on the foregoing analysis, the circuit court's judgment is

**AFFIRMED.**

GEATHERS and McDONALD, JJ., concur.